Stewart L. **UDALL**, Secretary of the Interior, Appellant,

v.

Norman M. **LITTELL**, Appellee.

No. 19725.

United States Court of Appeals District of Columbia Circuit.

Argued April 18, 1966.

Decided Sept. 2, 1966.

Petition for Rehearing En Banc Denied Oct. 14, 1966.

---

See also 119 U.S.App.D.C. 197, 338 F.2d 537.

Mr. Roger P. Marquis, Attorney, Department of Justice, with whom Messrs. Herbert Pittle and Thos. L. McKevitt, Attorneys, Department of Justice, were on the brief, for appellant.

Mr. Frederick Bernays Wiener, Washington, D. C., with whom Mr. John F. Doyle, Washington, D. C., was on the brief, for appellee.

Before EDGERTON, Senior Circuit Judge, and BURGER and LEVENTHAL, Circuit Judges.

BURGER, Circuit Judge.

This is an appeal by the Secretary of Interior from a permanent injunction prohibiting the Secretary from terminating Appellee's contract as General Counsel of the Navajo Indian Tribe,[1] enjoining any interference with that contract and requiring the Secretary to deal with Appellee as General Counsel.[2]

The central issues are whether the Secretary has power to administratively terminate Appellee's contract for cause and, if so, whether on the record the Secretary acted properly within the scope of his claimed administrative powers.

Appellee has had professional relations with the Navajo Tribe for a long period of time, serving in two separate but related capacities. From 1947 to 1957 he was General Counsel; he also served as claims attorney for the Tribe, prosecuting claims against the United States. Effective August 8, 1957, Appellee contracted with the Tribe to continue the working arrangement in this dual capacity for an additional 10 years. The statutes governing Federal supervision of tribal activities require that such contracts be approved by the Secretary in his capacity as overseer of tribal interests[3] and the Secretary approved this contract.

As General Counsel of the Tribe, Appellee received a fixed contract fee for handling current and what may be called routine legal work. The fees paid to a general counsel are disbursed by the United States Government. In general, and for present purposes, Appellee's relationship to the Tribe was not unlike that of a private practitioner representing a business enterprise having a variety of recurring legal problems the scope of which is reasonably well established and sufficiently predictable to relate to a fixed retainer fee. The contract provided an annual retainer fee of $25,000 for Appellee, which was later increased to $35,000, and also provided for assistants or associate general counsel who were paid fixed salaries which in 1963 totaled $95,000.

In their capacity as claims attorneys, Appellee and an associate received no

---

1. The Navajo Tribe consists of 100,000 American Indians occupying 24,000 square miles of territory in Arizona, New Mexico, Utah and Colorado; it is the beneficial owner of large assets, including more than eighty million dollars held in deposits in the United States Treasury. It is governed by an elected legislative body and a chairman; its affairs generally are subject to the jurisdiction of the Secretary of Interior.

2. The continuance of Appellee's contract as claims attorney is not at issue in this case, but Appellee's performance of that contract and its relations to his duties and obligations as General Counsel are crucial factors.

3. Rev.Stat. § 2103 (1878), as amended, 25 U.S.C. § 81 (1964).

fixed fees; the contract provided they would be paid 10% of such amounts as they "recovered, saved, or obtained," by preparing, investigating and prosecuting the Tribe's claims against the United States Government. The 1957 contract provisions relating to the General Counsel services explicitly provided, with one exception not here relevant, that the duties and functions of the associate General Counsel attorneys were not to include services relating to claims work and that such associates were not to participate in any way in the 10% contingent fees for claims work. This separation of compensation and duties becomes of particular significance in reviewing the Secretary's termination of Appellee's General Counsel services.

The contract provided for termination for good cause by action of the Tribal Council subject to the approval of the Commissioner of Indian Affairs, who is a subordinate of the Secretary of the Interior. The contract provided for performance of work by the attorneys under the direction of the Tribal Chairman, the Advisory Committee and the Council.[4] In addition to proscribing use of staff attorneys on claims cases, the contract prohibited any change in Appellee's compensation during the first five years of the contract.

Between 1957 and 1962 eleven amendments were made to the General Counsel contract now before us. Seven of these amendments added associate attorneys to the General Counsel staff at fixed salaries paid by the Tribe; these added lawyers were engaged at Appellee's behest because of an increasing work load, and six of the amendments [5] to the contract explicitly prohibited Appellee from using these additional attorneys on contingent fee claims matters unless he secured the approval of the Advisory Committee of the Tribal Council and the Commissioner of Indian Affairs.

The background of the dispute giving rise to the Secretary's cancellation of Appellee's contract is important to an understanding of the issues. In March 1963 Raymond Nakai was elected Chairman of the Navajo Tribal Council on a platform including a demand for the dismissal of Appellee as General Counsel. In his campaign Nakai claimed that Appellee had improperly obtained an increase in his annual fee from $25,000 to $35,000. After his election the new Chairman requested Appellee to refrain from taking part in Tribal political affairs. The new Chairman was unable to secure a majority vote in the Tribal Council to terminate Appellee's contract. However, the Tribal Council's Advisory Committee did adopt a resolution calling on the Secretary of Interior to "investigate, audit and terminate" Appellee's contract for various reasons including an expressed fear that Appellee was using the time and services of salaried staff attorneys on Appellee's claims work covered by the 10% contingent fee contract.

After the Advisory Committee had requested the Secretary to investigate Appellee's performance and conduct, the Solicitor of the Department of Interior sent a memorandum to the Secretary in October 1963 in which he suggested that if General Counsel staff attorneys had worked on Appellee's contingent fee claims cases without authority, the Tribe

---

4. Paragraph 3 of the contract states:
   3. Direction by Chairman, Advisory Committee, and Council: The said attorneys shall perform the duties required of them under this contract upon the request and at the direction of the Chairman of the Navajo Tribal Council, subject to such instructions as he may receive from time to time from the Advisory Committee or the Tribal Council. The General Counsel shall report to the Tribal Council at any regular or special meeting on any matters pertaining to the legal affairs of the Tribe when in his opinion or that of the Chairman, the Advisory Committee, or the Tribal Council, the best interests of the Tribe so require.

5. The seventh, Amendment Eleven, allowed the newly added General Counsel attorney to work on claims cases; this was not authorized, however, by the Tribal Council resolution on which Amendment Eleven purported to be based.

could offset the value of such professional time against any contingent fee later to become due under the claims agreement or, alternatively, could cancel Appellee's General Counsel contract. The Secretary then sent a copy of his Solicitor's memorandum to Appellee advising him that he would not "take any action pursuant to this memorandum until you have had a fair and full opportunity to controvert any or all of the points which are raised in it."

Subsequently the Secretary received two additional memoranda from his Solicitor; in one the Solicitor advised termination of Appellee's fixed fee contract as General Counsel unless it developed that the factual basis of the memorandum was incorrect. The Secretary then sent copies of both memoranda to Appellee, at the same time suspending and withdrawing approval of his General Counsel contract. The Secretary also stated his intention to terminate the General Counsel contract unless Appellee could "adduce convincing evidence that the conclusions justifying * * * termination are unwarranted." This communication from the Secretary concluded: "I have directed that you shall have a full and fair opportunity to present to the Solicitor any evidence which you have by way of explanation or exculpation. I would suggest that you promptly submit such evidence directly to the Solicitor."

Appellee failed to reply to the Secretary but commenced in November 1963 the litigation now under review, obtaining in the District Court a preliminary injunction barring any interference with his contract pending litigation. On appeal this Court by a divided vote affirmed the District Court, explicitly reserving judgment on the merits.[6]

Subsequently the suit was tried on the merits and the District Court granted the permanent injunction [7] now under review, the District Court holding that the Secretary lacked authority to terminate Appellee's contract and alternatively that, assuming the Secretary had such authority, his action was arbitrary and capricious. The District Court found as a fact that Appellee had "sometimes used and condoned the use of general counsel attorneys on claims litigation" without securing the approval of the Tribal Council and Indian Commissioner as required by the contract, but concluded, as a matter of law, this was not good cause for cancellation of the contract. The District Court reasoned that the Navajos had other adequate remedies for this unauthorized use of staff attorneys such as offsetting a claim for the use of general counsel attorneys against any contingent fees which might become due in future.

▮ The Secretary asserts that his authority to cancel the contract of a general counsel for an Indian tribe by administrative action is inherent in powers delegated to him by Congress. One statute delegates to the Secretary the supervision of the affairs and public business of Indian tribes;[8] another charges him with "the management of all Indian affairs and of all matters arising out of Indian relations." [9] We agree with the Government's view of the Secretary's powers under the statutory scheme.

In charging the Secretary with broad responsibility for the welfare of Indian tribes, Congress must be assumed to have given him reasonable powers to discharge it effectively. Courts have taken this approach with respect to various aspects of Indian life,[10] recognizing that "[t]his statute furnishes broad au-

---

6. Udall v. Littell, 119 U.S.App.D.C. 197, 338 F.2d 537 (1964).

7. Littell v. Udall, 242 F.Supp. 635 (1965).

8. Rev.Stat. § 441 (1878), as amended, 5 U.S.C. § 485(10) (1964).

9. Rev.Stat. § 463 (1878), 25 U.S.C. § 2 (1964).

10. See, e. g., Parker v. Richard, 250 U.S. 235, 39 S.Ct. 442, 63 L.Ed. 954 (1919) (supervision of lease income); United States v. Birdsall, 233 U.S. 223, 34 S. Ct. 512, 58 L.Ed. 930 (1914) (authority

thority for the supervision and management of Indian affairs and property commensurate with the obligation of the United States." [11] Mr. Justice Van Devanter, while a Circuit Judge, said:

> In our opinion the very general language of the statutes makes it quite plain that the authority conferred upon the Commissioner of Indian Affairs was intended to be sufficiently comprehensive to enable him, agreeably to the laws of Congress and to the supervision of the President and the Secretary of the Interior, to manage all Indian affairs, and all matters arising out of Indian relations, with a just regard, not merely to the rights and welfare of the public, but also to the rights and welfare of the Indians, and to the duty of care and protection owing to them by reason of their state of dependency and tutelage.[12]

Over a period of many years relations between tribes and their attorneys have been a source of deep Congressional concern; [13] the history of imposition on and overreaching of Indian tribes helps explain why Congress vested broad powers in the Secretary for the protection of the Indians. Appellee contends, however, that the existence of two statutes directing the Secretary to take certain actions with respect to contracts between tribes and their attorneys requires a strict interpretation of the Secretary's powers under the general supervisory provisions. The thrust of Appellee's contention is that the very passage of the two specific statutes indicates a Congressional view that the Secretary was not granted authority to cancel a general counsel contract. The two statutes Appellee relies on provide that a contract for legal services must be approved by the Secretary [14] and require a determination by the Secretary that the contract has been fulfilled before payments are made by the United States.[15]

These statutes were enacted in 1871 and 1872, subsequent to enactment of the two generalized statutes delegating supervision of the Indians to the Secretary.[16] This, Appellee argues, indicates the Secretary was not granted cancellation authority by the general statutes, for, if he had been, there would have been no need to add the specific sections directing him to take certain actions with respect to attorneys' contracts. Appellee seeks to buttress this argument by pointing to a third statute which followed the enactments of 1871 and 1872. The Act of April 29, 1874,[17] provided that contracts entered into prior to the 1872 Act also had to meet the requirements of the 1872 Act. Appellee argues this "shows virtually as a matter of mathematical certainty" that the Secretary does not have the power to cancel by administrative action. We cannot accept this contention or the premise of statutory interpretation which underlies it. Specific Congressional action to remedy an evil does not by itself indicate the Executive Branch lacks authority to act

---

to make recommendations concerning sentences for violations of laws on liquor traffic with Indians); *cf.* Boesche v. Udall, 373 U.S. 472, 83 S.Ct. 1373, 10 L.Ed.2d 491 (1963) (general managerial power over public lands includes authority to cancel administratively an invalid lease).

11. Armstrong v. United States, 306 F.2d 520, 522 (10th Cir. 1962).

12. Rainbow v. Young, 161 F. 835, 838 (8th Cir. 1908).

13. See S.Rep. No. 8, 83d Cong., 1st Sess. (1953).

14. Rev.Stat. § 2103 (1878), as amended, 25 U.S.C. § 81 (1964).

15. Rev.Stat. § 2104 (1878), 25 U.S.C. § 82 (1964).

16. 25 U.S.C. § 81 is derived from Acts of Mar. 3, 1871, ch. 120, § 3, 16 Stat. 570, and May 21, 1872, ch. 177, §§ 1, 2, 17 Stat. 136; 25 U.S.C. § 82 is Act of May 21, 1872, ch. 177, § 3, 17 Stat. 137. 25 U.S.C. § 2 is derived from Acts of July 9, 1832, ch. 174, § 1, 4 Stat. 564, and July 27, 1868, ch. 259, § 1, 15 Stat. 228; 5 U.S.C. § 485(10) originated in Act of March 3, 1849, ch. 108, § 5, 9 Stat. 395.

17. Act of April 29, 1874, ch. 135, 18 Stat. 35.

under other statutory provisions.[18] *Cf.* Copper Plumbing & Heating Co. v. Campbell, 110 U.S.App.D.C. 177, 182, 290 F.2d 368, 373 (1961).

We do not read the specific statutes relied on by Appellee as limiting the Secretary's powers under other statutes.[19] What can be drawn from the statutory scheme as a whole is that Congress has long been extremely sensitive concerning contracts between attorneys and Indian tribes. To interpret specific statutes in a manner which would plainly hinder the Secretary's efforts to oversee and protect Indian interests would hardly give effect to the overall Congressional purpose. To read the statutes as Appellee contends, so that the Secretary's approval once given would bar his cancellation of a contract on any grounds, would mean that these enactments would operate as protection of lawyers rather than of the Indian tribes. Congress had no such intent.

Moreover, the Secretary is required to investigate an attorney's performance to determine whether he has fulfilled his contract before any payments are made under it.[20] It can hardly be thought that Congress intended the Secretary would pay an attorney from tribal funds held in trust if the amounts were unreasonable or if the lawyer had not been faithful to the clients' interests, or was guilty of any other significant misconduct.

■ We hold that the broad authority vested by Congress in the Secretary to oversee Indian affairs, particularly in light of the long history of concern over tribal relations with attorneys, includes the power to cancel contracts between a tribe and its attorneys for cause by appropriate administrative action. The Secretary's approval of the contract is no bar to such cancellation for cause.

The final question is whether the Secretary's action was supported by substan-

---

18. A contemporaneous report indicates Congress was concerned with remedying a particular situation and did not consider whether its efforts were legally imperative. It indicates, moreover, that administrative laxity was at least partially to account for the legislative initiative. The temper of Congressional thinking is reflected in one paragraph of the Committee Report:

   And the committee expresses its surprise and regret that the authorities controlling Indian affairs have heretofore neither directed their own attention nor called the attention of Congress to the great and revolting waste of the patrimony of the Indians, and the continued and serious difficulties between them and the white people, caused by these corrupt and corrupting middlemen, who are shrewd enough to escape the evil results of their own villainies.

   House Committee on Indian Affairs, Investigation of Indian Frauds, H.R.Rep. No. 98, 42d Cong., 3d Sess. 3 (1873).

19. While we need not speculate to counter Appellee's speculation, it should be noted that applying Appellee's type of argument to another relevant statute could lead to an inference that Congress believed the Secretary possessed the authority to cancel. The Act of June 26, 1936, ch. 851, 49 Stat. 1984, 25 U.S.C. § 81a (1964), provides that claims contracts made before

that date could be for an indefinite duration, thus lifting the restrictions of Section 81 for a limited category of contracts. One of its provisos is "That nothing herein contained shall limit the power of the Secretary of the Interior, after due notice and hearing and for proper cause shown, to cancel any such contract or agreement." Appellee argues that this proviso merely permits the Secretary to cancel contracts which were being validated by the main body of the Section, *i. e.*, ones for an indefinite duration. This overlooks the fact that by using the phrase "limit the power" the proviso assumes an existing power and does not create a power. Such power, moreover, would have to relate to cancellation for other reasons than that the contract was of indefinite duration; since Section 81 made such contracts null and void, the Secretary would neither be required nor able to "cancel" them. The proviso, furthermore, speaks in terms of cancellation for proper cause. To say that this allows the Secretary to cancel those contracts inimicable to the interests of the Indians which are for an indefinite duration but not those which, while equally unjust, happened to be for a fixed time would be to impute to Congress a meaningless distinction.

20. Rev.Stat. § 2104 (1878) 25 U.S.C. § 82 (1964).

tial evidence or whether on the other hand it was arbitrary and capricious.[21]

The action of the Secretary was predicated on charges of violation of contract terms by Appellee and failure to perform faithfully the duties of legal counsel and adviser. The Secretary charged Appellee with violating his professional obligations toward the Navajo Tribe

(1) by increasing his compensation from $25,000 to $35,000 per year in 1961 without disclosing to the Tribe that such increase was prohibited by express contractual provisions;

(2) by reclassifying Healing v. Jones as a "claims" case under the purported authority of a Tribal Council resolution which did not in terms or intent authorize a reclassification of that case, an action which constituted a breach of trust and overreaching by placing Appellee in position to receive a 10% fee on the property involved in Healing v. Jones over and above his fixed fee as General Counsel; and

(3) by using staff attorneys employed and paid by the Tribe as assistants to the General Counsel to perform work on Appellee's contingent fee claims cases at the Tribe's expense, in violation of express contract terms and without full disclosure of the facts either to the Tribe or the Secretary.

At the outset we should note that if substantial evidence is found to support any one of these charges, the Secretary's action must be sustained since each of the charges goes to the very heart of the fiduciary duty of an attorney toward his client. In the posture of this case the burden rests on the Secretary, however, to show that the factual findings are plainly erroneous because unsupported by evidence or that the legal conclusions made by the District Court based on these findings are incorrect as a matter of law.[22]

Several factors stand out in this case. First, an attorney engaged in controversy with a client in relation to a contract for professional services is in some respects in a different posture from an ordinary litigant involved in an arms length commercial transaction; as an attorney he is bound to the highest duty of fidelity, honor, fair dealing and full disclosure to a client. Second, Appellee came into the District Court seeking equitable relief in the stringent form of injunction against governmental action. His burdens in these circumstances were heavy indeed and we must evaluate the action of that Court in light of these hornbook standards. It is elementary, of course, that one seeking equity must do equity and must show "clean hands" at the threshold. And this being so as to the ordinary seeker of equity it can surely be no less true when an attorney seeks extraordinary equitable relief virtually constituting specific performance of a professional services contract[23] against his client and against the client's guardian, as the Secretary of Interior is in this context.[24]

---

21. Administrative Procedure Act § 10(e), 60 Stat. 243 (1946), 5 U.S.C. § 1009(e) (1964).

22. The 118 Findings of Fact and 23 Conclusions of Law cover 37 printed pages of the Joint Appendix. Many of the Findings and Conclusions are irrelevant to the basic controlling issues of Appellee's *bona fides* in his relations with his client.

23. The Government makes forceful arguments on the lack of judicial authority to enforce virtual specific performance of a contract for personal, confidential services. In a not dissimilar situation the Eighth Circuit rejected recourse to equitable relief to reinstate an attorney in his employment as legal adviser to an Indian tribe. "The relationship of attorney and client is such as to require perfect confidence between the parties, and, of course, could not be continued by a decree in equity against the will of either party." Adams v. Murphy, 165 F. 304, 311 (8th Cir. 1908).

24. That greater independence for Indians is the laudable ultimate objective does not undermine or impair the Secretary's duty to help protect the Indians from their own improvident acts or from over-

The basic elements of the attorney-client relationship are not changed because the contract for services is expressed in a formal written contract. Indeed the very making of a formal contract and its performance impose a high duty on the attorney because he is dealing in an area in which he is expert and the client is not and as to which the client must necessarily rely on the attorney. This, among other factors, suggests the crucial importance of the supervision and overseeing by the Secretary of all relations between Indian tribes and attorneys. This is not to suggest that a formal contract is unimportant but rather that a formal long-term contract, superimposed on the normal attorney-client relationship, alters the relationship only by adding new dimensions of duties and obligations on the attorney.[25]

The background revealed by this record shows a steadily deteriorating relationship between Appellee and the Tribe for some period before cancellation of the contract. The indications are found in Chairman Nakai's election in 1963 on a platform of "Littell-must-go", in the divided Tribal Council, and finally in the Advisory Committee's demand that Appellee's conduct be investigated by the Secretary and that he be dismissed as General Counsel. The record overflows with bitter charges and counter charges attacking not only conduct but motivation of "opponents"; it reflects an atmosphere which negated any possibility of continuance of a normal professional relationship between Appellee and the Tribe's Chairman, the Advisory Committee and some members of the Tribal Council. The barest recital of the unseemly squabble reflected in the record is sufficient to demonstrate that it must be the ultimate responsibility of the Government in the person of the Secretary to see that such controversies do not develop, or if they do, to terminate them by administrative action. The interests of the Navajos demanded that the controversy cease.

The Secretary's action must be viewed against this background, although we need not pass on all of the charges and counter charges; it is enough that undisputed evidence and indeed admissions of Appellee showed that he had used salaried staff lawyers of the Tribe to perform services on claims cases for which he had contracted to supply all legal services for a 10% contingent fee. His contingent fee engagement might call for him to hire numerous legal aides but this would be for his own account and at his own expense. His use of salaried Tribal employees to perform his work on claims cases without first obtaining the approval prescribed by the contract was a clear violation of the contract; his failure to make full disclosure to the client and the Indian Commissioner was a further breach of his fiduciary duty. This was more than "intermixture" or "commingling" of Tribal assets with his own assets; it was an affirmative use—or misuse—of assets of the Tribe for his own interest.

It is argued that this is not significant for two reasons: first, that the Tribe would ultimately receive 90% of the benefit of these borrowed attorney services and, second, that as claims were collected an adjustment for the borrowed services could be made, presumably by reimbursing the Tribe by way of offset to the extent of the value of such services. There are numerous fallacies in these theories.

By the very nature of the situation only Appellee could know how much time had been devoted by General Counsel staff attorneys to claims work, and for

reaching by outsiders. Indian wards, like individual wards, may often require the intervention of the guardian to prevent unwise action or dissipation of assets.

25. Contracts made by persons in fiduciary relationship with the other party are always subject to close scrutiny and often treated as presumptively voidable. *E. g.*, Spilker v. Hankin, 88 U.S.App.D.C. 206, 188 F.2d 35 (1951); Neary v. Markham, 155 F.2d 485 (10th Cir. 1946).

him to know, precise records allocating time between claims and routine counsel services would be required. In his testimony in the District Court Appellee conceded that allocation was difficult. But the very difficulty of making such allocation—all of which was under his immediate control—is one of the reasons why such interchange should not have occurred. Very likely this was a factor which led the Tribe to prohibit such use of Tribal attorneys on claims cases except with careful safeguards. If this contract proviso was unworkable or unduly onerous it should never have been accepted or, having been, should have been changed.[26] We noted earlier that Nakai, in his campaign for election as Chairman, contended Appellee was wrongfully using staff attorneys on claims cases; these issues obviously developed over a period prior to 1963.

■ The argument that the Tribe would benefit 90% from Appellee's use of staff attorneys is specious on its face. It is no defense for a fiduciary to say that he will share the profits of assets he borrows from a trust account and invests, whether in a speculative enterprise or in a "blue chip."

■ Furthermore, if the claims cases came to nought no fund would exist for offset adjustments, since the Tribe's only obligation for payment for any legal services on claims cases was contingent on a recovery. In any event, the availability of an offset remedy if and when contingent fees became due could not affect the alternative remedy of administrative cancellation of the contract for misuse of staff attorneys. Indeed, the probabilities of success or failure of the claims litigation are irrelevant to the propriety of Appellee's use of staff attorneys to prosecute the claims cases. The happy flowering of an unauthorized investment of trust assets by a fiduciary does not alter the nature of the original diversion.

It is not necessary for us to treat all of the multitude of Findings and Conclusions of the District Court but only to determine the narrow question whether there was a rational and valid basis for the Secretary to conclude that Appellee's conduct and performance of his contract afforded a legally sufficient basis for cancelling that contract. Our analysis of the record evidence on this score, against the statutory background, makes it clear that, apart from all other factors, Appellee's admitted unauthorized use of Tribal staff attorneys on claims cases constituted adequate grounds for cancelling his contract as General Counsel.

Once the District Court found, as Appellee's admissions required, that Appellee had diverted Tribal assets in the form of services of General Counsel staff attorneys to work on claims cases, a conclusion of law was compelled that the Secretary had adequate grounds to terminate Appellee's contract. This makes it unnecessary to deal with other findings of fact or conclusions of law. Accordingly the judgment for a permanent injunction is vacated and judgment entered in favor of Appellant.

Reversed and remanded.

---

**26.** Appellee points to nothing in the record to show that he instructed staff attorneys to keep records which would allow for an accounting adjustment for the borrowed services, assuming arguendo this would solve the problem.