F. E. L. PUBLICATIONS, LTD., a corporation, Plaintiff,

v.

CATHOLIC BISHOP OF CHICAGO, a corporation, Defendant.

No. 76 C 3471.

United States District Court, N. D. Illinois, E. D.

Jan. 9, 1981.

---

Charles A. Laff, Larry L. Saret, Laff, Whitesel & Rockman, Chicago, Ill., for plaintiff.

Valentine A. Weber, David W. Maher, James Serritella, Reuben & Proctor, Chicago, Ill., for defendant.

Memorandum

LEIGHTON, District Judge.

I

The plaintiff, F. E. L. Publications, Ltd., allegedly owns 21 copyrights to liturgical hymnals and songbooks, each containing large amounts of materials said to be wholly original either with plaintiff or its assignor, one Dennis Fitzpatrick. In a second amended and supplemental complaint, it alleges in 21 counts that defendant, the Catholic Bishop of Chicago, himself or his agents and employees, have infringed these copyrights "by publishing, distributing and/or selling in this district songbooks including songs which were copied largely from plaintiff's aforesaid copyrighted work, and/or by allowing others to publish, distribute and sell songbooks on property owned, controlled, and supervised by the Catholic Bishop [sic]."[1] Then, in three additional counts plaintiff invokes the pendent jurisdiction of this court and makes claims which in substance are based on the laws of Illinois.

Defendant has answered, denied all material allegations of the complaint; and has pled 19 affirmative defenses, two of which, the 8th and 11th, assert the claim that plaintiff has misused its copyright monopoly. The historical and material facts which give rise to the controversy between the parties, including the defense of copyright misuse, are not in dispute.

II

In December 1961, Pope John XXIII convoked the Second Vatican Council. Such councils function to formulate law, practice, and doctrine for the Roman Catholic Church. The purpose of the council was to make those church observances which are open to changes more responsive to the requirements of modern times.

In late 1963, Second Vatican promulgated the *Sacred Constitution on the Liturgy*. Liturgy is the body of rites prescribed for public worship in the Roman Catholic Church. The *Sacred Constitution* changed Catholic liturgy in two respects. First, it provided that religious services may be conducted in the vernacular. Prior to this, Roman Catholic religious services were conducted in Latin. Second, it compelled encouragement of active participation by the congregation in the religious service. In this country and in others, this allowed a congregation to sing Psalms and hymns during the mass, in English. Prior to Second Vatican, Roman Catholic religious services were conducted almost exclusively by the priest, and if songs were sung at all, this was done only by the choir, and in Latin. The changes made by Second Vatican caused a period of adjustment within the parishes of all American archdioceses.

The *Sacred Constitution* also encouraged development of liturgical music in the vernacular, citing the need to provide an opportunity for the entire assembly of the faithful to actively participate. From this need a new market arose, a market for

[1.] The Catholic Bishop of Chicago is the juridical entity for the Roman Catholic Archdiocese of Chicago. He is a corporation sole under a special act of the Illinois legislature, *Private Laws of Illinois*, 22nd General Assembly, p. 78 (1861). He is also a natural person; and for this reason, in this memorandum he will be referred to as such by personal pronouns.

Catholic liturgy music in the English language. The Church, in an effort to maintain its independent identity, did not consider existing English hymns of the Protestant reform appropriate for use in Catholic religious activities.

Pursuant to the dictates of Second Vatican, administrative co-ordinating commissions were created to implement the new reforms. An example of this is the Liturgy Commission of the Archdiocese of Chicago. Founded in 1964, its role was to keep abreast of developments in liturgy and communicate them to the parishes. Currently this function is served by the Liturgy Advisory Board, which advises the Director of the Office of Divine Worship and the Cardinal of the Archdiocese on the liturgical needs and concerns of the parishes.

The Liturgy Commission of the Archdiocese of Chicago determined that liturgy teams should be formed in the parishes to implement Second Vatican reforms. These teams typically included the parish priest and representatives of the laity. Before Second Vatican, the priest was the sole minister at a service of the Catholic Church. After Second Vatican reforms, other members of the congregation actively participated in the administration of communion and were allowed in the sanctuary during mass. The form of religious services was changed in order to expand the participation from the traditional roles of priest and choir, to include all those present. The effort was to allow the congregation to celebrate the mass, and in its own language.

These developments led to a search by Catholic parishes for music and prayer which conveyed the message of the Church in contemporary terms. Plaintiff, formerly known as Church Publications, Ltd., is one among many companies which began publishing English language hymnals suitable for this use. Its founder, composer, and president, Dennis J. Fitzpatrick, entered this business with *Hymnal for Young Christians* in 1966. Subsequently, he obtained copyrights to several other works, some the subject of this suit, which he assigned to the plaintiff.

All of plaintiff's hymnals and songbooks concerning which it brings this suit are compilations or collective works. A number of them contain the substance of Catholic liturgy that were originally composed during the early years of the Roman Catholic Church. Some of the songs have an origin that has been lost in antiquity. Included in the hymnals are traditional historical religious songs which have long been in the public domain, some of which have been set to a different melody by a large number of composers who, plaintiff alleges, were its employees. Those works which are in the public domain are grouped with original works by plaintiff's authors and composers and for which no royalties from licensing revenues are paid. The materials in the public domain included in plaintiff's copyrighted works are distinguished in its accounting books by the notation "P.D." Many of the songs included in plaintiff's hymnals and songbooks are themselves not protected by any copyright. The right to use songs composed by other authors is obtained by plaintiff through exclusive assignment to it of the right to license their use in return for payment of royalty, and by exclusive assignment to it of copyrights obtained by other authors and composers, again with the right to license use of the copyrighted works.

Prior to 1972, plaintiff occasionally authorized Catholic parishes, religious organizations, and publishers to copy its music at two cents per copy, per song. In November of that year, it initiated a new marketing procedure which it called an "Annual Copy License", hereafter referred to as ACL. This marketing technique was in response to plaintiff's heightened awareness of unauthorized copying of its musical works. At the time it announced the ACL, plaintiff offered three methods by which a customer could obtain the benefit of its copyrighted works.

One allowed the prospective purchaser to accept the provisions in its ACL and pay $100 per year for the "right to make unlimited numbers of copies from F. E. L.'s printed page or from user's own original master

copy." The right was to terminate one year after the ACL was purchased. Further, the purchaser was granted "the right to perform the music and/or text at not-for-profit performances for purpose of worship and/or classroom use [sic]."

The second was a "[o]ne time usage plan" which, for 2¢ per copy per song, with a minimum charge of $10, allowed the customer to purchase the right to use any song of his choice. After the one use, at a wedding or funeral, the copies had to be destroyed.

The third and last allowed the customer to buy copies of plaintiff's hymnals and songbooks, regardless of whether the customer desired permanent copies of all or only a few selections.

The terms of the ACL incorporated a master title index that listed the 1400 songs owned by plaintiff, together with the names of the composers. The church that wanted to use one of plaintiff's listed songs could not deal directly with any of the authors or composers whose musical works or copyrights had been exclusively assigned to the plaintiff. The ACL as a type of marketing was not, and still is not employed by any other publisher of religious music in this country; plaintiff acknowledges that this marketing method was a pioneering effort in the field of religious music licensing. Its ACL differs from traditional marketing of music in that it does not distinguish between songs, but charges a lump sum for which the licensee receives copying and use rights to all of plaintiff's 1400 available compositions, even though the purchaser may desire to use only a few of the more popular songs. It also differs from usual marketing practices in that it relies heavily on the licensee to patrol his own use. On the anniversary of the license, the customer has to destroy all copies he has made of the virtually unlimited number allowed, unless he decides to pay plaintiff another $100 for an additional year of the ACL. The effect is that the copies are the property of the buyer only as long as he is able, or allowed, to continue buying the right annually. Plaintiff has sought to enforce its ACL, allowing past violators to redeem themselves by remitting a proportionate monthly fee multiplied by the duration of the claimed infraction.

Defendant's archdiocese contains 447 parishes. Of these, between 22 and 30 had purchased plaintiff's ACL at the time the complaint in this case was filed. Nine had paid plaintiff for prior copying releases; and in 149 there had never been any copying of plaintiff's songs or music. In 122 of them, if there had been any copying, this had occurred more than three years before plaintiff filed its suit in this case, but homemade hymnals had been distributed at masses and church services after 1973. There were insertions in these hymnals of some of the more popular of plaintiff's copyrighted songs in the other of defendant's parishes. The copying was apparently done by priests and laymen of these parishes. All of the copying, and their use by distribution to parishioners, were only for the purpose of enabling members of the congregation to participate by singing in a Catholic mass, a not-for-profit religious service. No sale was ever made of any of plaintiff's copied songbooks or musical works.[2]

---

**2.** In each of the 21 counts of its second amended and supplemental complaint, plaintiff alleges that there were sales of "songbooks ... copied largely from [its] aforesaid copyrighted work." However, defendant has supported his motion for summary judgment with affidavits which show that despite one instance of a mimeographed book containing a price tag of $5, no sale has ever been made of a songbook copied from plaintiff's copyrighted works. Plaintiff does not contradict these affidavits; therefore, plaintiff relies only on its allegations concerning sales.

It is well established that an adverse party may not rest on the allegations of his pleadings when a motion for summary judgment is made. *Macklin v. Butler*, 553 F.2d 525 (7th Cir. 1977); cf. *Weit v. Continental Illinois Nat. Bank and Trust Co. of Chicago*, 467 F.Supp. 197 (N.D.Ill. 1978); Fed.R.Civ.P. 56(e). Accordingly, this court concludes that neither defendant nor any of his agents or employees have ever sold a songbook copied from plaintiff's copyrighted works.

### III

Based on these facts, supported by affidavits, excerpts from depositions, and exhibits, defendant has moved for summary judgment on his affirmative defenses that plaintiff has misused its copyright monopoly, comes to this court with unclean hands, and is thus not entitled to any relief on its claim of copyright infringement. Defendant argues that the Copyright Act of 1909 did not give plaintiff the right to license the not-for-profit singing of hymns at a mass or other religious service; and in imposing on Catholic parishes its ACL, plaintiff has misused its alleged statutory monopoly on the right to copy by compelling churches to pay for not-for-profit performances which involve the singing of religious songs. Further, defendant contends that plaintiff's ACL policy misuses its copyright monopoly by tying the purchase of all its religious compositions (its least popular ones), to its most popular or "blockbuster" songs.

Plaintiff opposes defendant's motion for summary judgment, arguing that it asserts only a broad, vague defense of copyright misuse; and that defendant's theories merely express his dislike for the way plaintiff does business but do not provide a defense to copyright infringement. As to the theory that plaintiff has illegally extended its copyrights by licensing not-for-profit performances of songs at religious services, plaintiff contends this is not relevant and thus need not be considered because the claim of infringement by performance has not been asserted in this case. Against defendant's theory that the ACL is an illegal tying arrangement in violation of the antitrust laws, plaintiff argues that this contention has been considered and rejected in the context of blanket copyright licenses in *Columbia Broadcasting System, Inc. v. American Soc. of Composers*, 400 F.Supp. 737 (S.D.N.Y.1975), *rev'd*, 562 F.2d 130 (2d

Cir. 1977), *rev'd, Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), *on remand, Columbia Broadcasting System, Inc. v. American Soc. of Composers, Authors and Publishers*, 607 F.2d 543 (2d Cir. 1979) *and* 620 F.Supp. 930 (2d Cir. 1980).

Thus the issue presented is whether plaintiff's ACL is a misuse of its copyright monopoly to hymnals and musical works described in this lawsuit and bars it from recovery for the copyright infringement alleged. Resolution of this issue requires this court to determine (1) whether plaintiff's ACL was a means by which it sought to license the not-for-profit performance of religious songs for worship, and an unlawful extension of plaintiff's copyright monopoly; and (2) whether plaintiff's ACL is a tying contract *per se* illegal under the Sherman Act.

### IV

A. *Is plaintiff's ACL a means by which it sought to license the not-for-profit performance of religious songs for worship and thus an unlawful extension of its copyright monopoly?*

In November 1972 when plaintiff's ACL policy was announced, its founding composer and president, Dennis J. Fitzpatrick, knew, and as a consequence so did plaintiff, that there were people in Catholic parishes who made either Xeroxed or typewritten hymnals from songs in copyrighted hymnals, but only for the purpose of enabling a congregation to participate in the mass or other religious service. Of course, to the extent this was done to plaintiff's musical works, this could have been held to be copyright infringement under the Copyright Act of 1909.[3] *Wihtol v. Crow*, 309 F.2d 777 (8th Cir. 1962). As the market for Catholic liturgical music developed, Fitzpatrick also knew, as did plaintiff, that there was, for

---

3. In its second amended and supplemental complaint, plaintiff alleges that "[a]ll references to the Copyright laws refer to the 1909 Copyright Act in effect at the time this suit was filed, not to the 1976 Copyright Act which became effective on January 1, 1978." In its answer, defendant appears to agree with this

view. In fact, plaintiff's position is supported by the cases. *See Walt Disney Productions v. Air Pirates*, 581 F.2d 751 (9th Cir. 1978) *cert. denied, O'Neill v. Walt Disney Productions*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979); *cf. Davies v. Bowes*, 209 F. 53 (D.C.N.Y.1913), *aff'd*, 219 F. 178 (2d Cir. 1914).

one reason or another, the copying from published musical works in American Catholic parishes. In fact, his November 1972 letter addressed to "Dear Worship Leader", and sent to Catholic churches throughout the country, discussed the general problem of hymnal copying and announced that "[f]or a one time annual payment of $98.76 [later raised to $100] you may copy in any form you choose, in any quantity you wish, with unlimited usage during the year, any music and/or text; in any arrangement, accompaniment or edition; printed, published and copyrighted by F. E. L. Publications, Ltd."

The license was intended to grant a "specific church and/or school, or institution, or local chapter of an organization, ..." referred to as the "User", the right to copy any music or text copyrighted by the plaintiff. It defined the "additional rights of user" in Article 4 and provided that "User" could "perform the music and/or text at not-for-profit performances for purposes of worship...." In Article 5, the license provided a ministry exception by which the "[u]ser agrees to confine use of the copies to users' premises ..." identified as the church or other place of worship named on the license.

The provisions of the license were carefully drawn to preclude any sale of copies made of any music or text owned by the plaintiff. F. E. L. told its licensees that "[s]eparate charges and licenses are required to permit copies to be sold to the congregation or others when allowed by F. E. L." The user further agreed "not to sell, lend, or otherwise dispose of the copies to any church, school, entity, or person other than those persons in the service of users (agents) and necessary to permit user to carry out the uses licensed herein."

Fitzpatrick knew, and so did plaintiff, that Catholic parish priests and those who worked with them, did not engage in the business of copying songs into hymnals for the purpose of sales. Therefore, plaintiff is charged with the knowledge that the only use to which copied hymnals are put in a Catholic parish is the singing from them by a congregation in a mass or other religious service, all not-for-profit performances.

The exclusive rights as to copyrighted works given a copyright owner by Section 1(e) of the Copyright Act of 1909 includes performance of "the copyright work publicly for profit if it be a musical composition; and for the purpose of public performance for profit, and for the purposes set forth in subsection (a) hereof, to make any arrangement or setting of it or of the melody of it in any system of notation or any form of record in which the thought of an author may be recorded and from which it be read or reproduced...." Courts which have construed this section have uniformly held "that the monopoly given the copyright owner is only to perform his work 'for profit' ".[4] *Associated Music Publishers, Inc. v. Debs Memorial Radio Fund, Inc.*, 141 F.2d 852, 854 (2nd Cir. 1944), *cert. denied, Debs Memorial Radio Fund v. Associated Music Publishers*, 323 U.S. 766, 65 S.Ct. 120, 89 L.Ed. 613 (1944); *cf. Buck v. Hillsgrove Country Club, Inc.*, 17 F.Supp. 643 (D.C.R.I. 1937); *Gay v. Robbins Music Corporation*, Supp., 38 N.Y.S.2d 337 (1942); and *see* Andur, *Copyright Law and Practice*, 405–406 (1956).

■ This, however, does not mean that money has to be collected at the door of the place where the copyrighted music is performed. In *Herbert v. Shanley Co.*, 242 U.S. 591, 37 S.Ct. 232, 61 L.Ed. 511 (1917), the Supreme Court had before it two cases in which copyrighted musical works were performed in a restaurant and a hotel dining room for the entertainment of patrons who did not pay to hear the music. The courts below had ruled that these performances did not infringe the copyrights. However, speaking for the court, Mr. Justice Holmes said, 242 U.S. 591 at 594–595, 37 S.Ct. at 233:

the exclusive right "[t]o print, reprint, publish, copy, and vend the copyrighted work." 17 U.S.C. § 1(a).

---

4. The purposes set forth in Subsection (a) of Section 1, Copyright Act of 1909, are to give any person complying with the copyright laws

"If the rights under the copyright are infringed only by a performance where money is taken at the door, they are very imperfectly protected. Performances not different in kind from those of the defendants could be given that might compete with and even destroy the success of the monopoly that the law intends the plaintiffs to have. It is enough to say that there is no need to construe the statute so narrowly. The defendants' performances are not eleemosynary. They are part of a total for which the public pays, and the fact that the price of the whole is attributed to a particular item which those present are expected to order is not important."

Therefore, it is not the payment of money that determines whether a performance is for profit; it is the nature of the performance. *Cf. Robert Stigwood Group, Ltd. v. O'Reilly*, 346 F.Supp. 376 (D.C.Conn.1972), *rev'd*, 530 F.2d 1096 (2d Cir. 1976), *cert. denied, O'Reilly v. Robert Stigwood Group, Ltd.*, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976). See Annot. 23 A.L.R.Fed. 974.

From this principle, it can be deduced that aside from the question whether the occasion is public, the singing of hymns in a Catholic mass or other religious service is a not-for-profit performance. *See Wihtol v. Crow*, 199 F.Supp. 682, 685 (S.D.Iowa 1961), *rev'd on other grounds* 309 F.2d 777 (8th Cir. 1962); *cf.* 17 U.S.C. § 104 *repealed by* P.L. 94-553, October 19, 1976. But the copyright monopoly which the owner of a copyright to a musical composition enjoys is only the right to exclude others from performing the composition "in public for profit...." 17 U.S.C. § 1(e). In other words, the copyright laws have always distinguished the performance of musical and nondramatic literary works for profit from those performances which are not-for-profit. Nimmer, in discussing the underlying rationale for this distinction, one that is found in the Copyright Act of 1909, tells us:

"It was thought that to prohibit unlicensed nonprofit performances of musical and nondramatic literary works in such places as schools and churches would constitute an undue restriction on the bene-fits which should be available to the public." 2 *Nimmer on Copyrights* § 8.15[A] at 8-144 (1980).

■ In this case, the only use to which a licensee under plaintiff's ACL could put copied music was the "not-for-profit performances [of the musical works] for purposes of worship...." This fact becomes clear when the Destruction Clause, Article 8 of the ACL is considered. It is there required that the "User ... destroy all copies licensed herein and to notify F. E. L. ... within ten days after the expiration of this license ... that copies were destroyed." This being the case, the conclusion is inescapable that plaintiff's ACL is simply a means by which it licensed the not-for-profit religious performances of its copyrighted works; it is an extension of its copyright monopoly not authorized by the copyright laws. *See M. Witmark & Sons v. Jensen*, 80 F.Supp. 843 (D.Minn.1948), *app. dism'd, M. Witmark & Sons v. Berger Amusement Co.*, 177 F.2d 515 (8th Cir. 1949). A copyright owner, like a patentee, may not increase the scope of the monopoly afforded by the copyright through a license agreement with a licensee. *Krampe v. Ideal Industries, Inc.*, 347 F.Supp. 1384, 1386 (N.D.Ill.1972).

**B.** *Is plaintiff's ACL a tying contract illegal per se under the Sherman Act?*

■ Despite plaintiff's originality as a publisher of religious music, its ACL is a blanket license. *See Columbia Broadcasting System, Inc. v. American Society of Composers*, 400 F.Supp. 737, 743 (S.D.N.Y. 1975), *rev'd on other grounds* 562 F.2d 130 (2d Cir. 1977), *rev'd, Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), *on remand, Columbia Broadcasting System, Inc. v. American Soc. of Composers, Authors and Publishers*, 607 F.2d 543 (2d Cir. 1979) *and* 620 F.Supp. 930 (2d Cir. 1980). A blanket license, as plaintiff insists, is not *per se* unlawful under the antitrust laws where it is granted by nonexclusive agents of copyright owners, and an acceptable mechanism for at least a part of the market is available to those who want to purchase

the right to perform copyrighted musical compositions. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 22, 99 S.Ct. 1551, 1564, 60 L.Ed.2d 1 (1979). Nor is such a license, under the law of reason, a violation of the antitrust laws in the absence of evidence that its existence restrains competition among owners of copyrights to musical selections. *Columbia Broadcasting System, Inc. v. American Society of Composers*, 620 F.2d 930, 939 (2d Cir. 1980). In *Columbia Broadcasting System, Inc. v. American Society of Composers*, 400 F.Supp. 737, 781 (S.D.N.Y.1975) *rev'd on other grounds* 562 F.2d 130 (2d Cir. 1977), *rev'd, Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), *on remand, Columbia Broadcasting System, Inc. v. American Soc. of Composers, Authors and Publishers*, 607 F.2d 543 (2d Cir. 1979) *and* 620 F.Supp. 930 (2d Cir. 1980), the district court held that the case before it involved a blanket license and was essentially one of tie-in or block booking which required proof of coercion to establish illegality under the antitrust laws; but issuance of a blanket license under provisions of consent decrees which allowed direct licensing from individual owners of copyrights saved the scheme from being coercive and, hence illegal.

Here, however, by obtaining assignments of the songs with the right, on behalf of the composers, to license their use for an annual fee, and by obtaining assignment of copyrights for the same purpose, plaintiff either absolutely controls or has ownership power over copyrights to hymnals, songbooks, and the 1400 religious songs listed in its master title index. A Catholic church or parish that wants to purchase the right to copy and use a song either in one of plaintiff's hymnals, songbooks, or those listed in its master title index, cannot deal directly with owners of the copyrighted works listed by plaintiff. In most instances, a church or parish does not desire permission to use all of plaintiff's listed songs; there is no interest in all of the songs in plaintiff's hymnals, songbooks, and listed in the master index. The most desired are about 25 or 30 of the more popular or "blockbuster" songs. Yet,

plaintiff's policy has always been "all or nothing"; the church or parish desiring to purchase the right to copy and use some of the listed songs has to pay for permission to use all of them. The songs are different; in many instances, the composers are different, yet purchase of the right to use the more popular has been tied by the plaintiff to the purchase of all, including the less popular.

■ It is now well known that a tying arrangement whereby a party agrees to sell one product but only on condition that the buyer also agrees to purchase a different or tied product is prohibited by the Sherman Act, and by the Clayton Act. *See Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972); *cf. Tire Sales Corp. v. Cities Service Oil Co.*, 410 F.Supp. 1222, 1227 (N.D.Ill.1976). In the field of copyrighted feature motion pictures, a subject matter analogous to the licensing of copyrighted music, the Supreme Court has held that block booking, that is, tying the sale of wanted motion picture films to a package containing one or more unwanted or inferior films, is a violation of the Sherman Act. *United States v. Loew's, Inc.*, 371 U.S. 38, 49, 83 S.Ct. 97, 104, 9 L.Ed.2d 11 (1962). Earlier, in *United States v. Paramount Pictures*, 334 U.S. 131, 159, 68 S.Ct. 915, 929, 92 L.Ed. 1260 (1948), the Court in an opinion by Mr. Justice Douglas, held categorically that it was illegal under the Sherman Act for a licensor to refuse to license one or more copyrights unless another copyright is accepted. Said Mr. Justice Douglas, 131 U.S. at 158, 68 S.Ct. at 929:

Where a high quality film greatly desired is licensed only if an inferior one is taken, the latter borrows quality from the former and strengthens its monopoly by drawing on the other. The practice tends to equalize rather than differentiate the reward for the individual copyrights. Even when the films included in the package are of equal quality, the requirement that all be taken if one is desired increased the market for some. Each stands not on its own footing but in

whole or in part on the appeal which another film may have.

■ This statement, made concerning different motion picture films, is equally applicable to the different copyrighted songs on plaintiff's master title index. The right to copy and perform the high quality, or so-called "blockbuster" songs on plaintiff's list which Catholic parishes and churches desired could be obtained by them only if the inferior ones were taken; thus the latter group of songs borrowed quality from the former and strengthened its monopoly by drawing on the other. This being so, it must be concluded that plaintiff's ACL involving copyrights is a tying contract which is illegal *per se* under the Sherman Act. *Cf. Alden-Rochelle, Inc. v. American Soc. of C., A. and P.*, 80 F.Supp. 888 (S.D.N.Y.1948); see Annot., *Antitrust-Tying Arrangement*, 46 A.L.R.Fed. 516.

## V

A copyright, like a patent, is a statutory grant of monopoly privileges. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 29, 99 S.Ct. 1551, 1567, 60 L.Ed.2d 1 (1979) (Stevens, J., dissenting; concurring on this point). Being a statutory grant, the rights are only such as the statute confers, and may be enjoyed only on the terms and conditions which it specifies. *See Loew's, Inc. v. Columbia Broadcasting System, Inc.*, 131 F.Supp. 165, 173 (S.D.Cal. 1955), *aff'd, Benny v. Loew's, Inc.*, 239 F.2d 532 (9th Cir. 1956), *aff'd, Columbia Broadcasting System, Inc. v. Loew's, Inc.*, 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed.2d 583 (1958); 18 C.J.S. Copyright and Literary Property § 18. And as one eminent authority has pointed out, "The Copyright Act accords to each copyright owner a limited form of monopoly. An attempt to extend the scope of this monopoly will, under certain circumstances, result in violation of the antitrust laws.... Apart from the issue of antitrust violation ... courts will on occasion invoke the equitable doctrine of unclean hands [a concept which includes copyright misuse] as a defense in a copyright infringement action ... whether [it] is one of law or in equity." *3 Nimmer on Copyrights* § 13.09[A][B]. The policy underlying the misuse doctrine is designed to prevent a patentee [and a copyright owner as well] from projecting the economic effect of his admittedly valid grant beyond the limits of his legal monopoly. *Panther Pumps & Equipment Co. v. Hydrocraft, Inc.*, 468 F.2d 225, 231 (7th Cir. 1972) *cert. denied, Hydrocraft, Inc. v. Panther Pumps & Equipment Co.*, 411 U.S. 965, 93 S.Ct. 2143, 36 L.Ed.2d 685 (1973); *cf. M. Witmark & Sons v. Jensen*, 80 F.Supp. 843 (D.Minn.1948), *app. dism'd, M. Witmark & Sons v. Berger Amusement Co.*, 177 F.2d 515 (8th Cir. 1949); *United States v. United States Gypsum Company*, 124 F.Supp. 573, 594 (D.C.D. C.1954); *see Morton Salt Co. v. G. S. Suppiger Co.*, 314 U.S. 488, 493, 62 S.Ct. 402, 405, 86 L.Ed. 363 (1942) *reh. denied*, 315 U.S. 826, 62 S.Ct. 620, 86 L.Ed. 1222.

In the case at bar, this court has determined that through the terms of the ACL, plaintiff extended the monopoly privileges of its copyrights by licensing not-for-profit performances of copyrighted religious music for worship. This the plaintiff could not do. *See CableVision, Inc. v. KUTV, Inc.*, 335 F.2d 348, 351 (9th Cir. 1964), *cert. denied, Klix Corp. v. CableVision, Inc.*, 379 U.S. 989, 89 S.Ct. 700, 13 L.Ed.2d 609 (1965). The court has also determined that plaintiff's ACL is a tying contract which is *per se* illegal under the Sherman Act. *United States v. Loew's, Inc.*, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); *United States v. Paramount Pictures*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). Thus, the undisputable facts show that plaintiff, through the policy represented by its ACL, has misused its copyright monopoly in the hymnals and the listed religious musical works described in this lawsuit. It continues to do so; in fact, it has expanded the utilization of this licensing policy.[5]

---

5. For example, in 1977 plaintiff joined several of its competitors in forming The Copyright Sharing Corporation. The three corporate officers of the newly created corporation are the same as F.E.L.'s. The licensing arrangement which is offered by the new corporation is

Insofar as plaintiff seeks injunctive relief, its suit is one invoking the equity jurisdiction of this court. *Tempo Music, Inc. v. Myers*, 407 F.2d 503, 507 n.8 (4th Cir. 1969). But a court of equity will not aid a wrongdoer, a rule having its origin in the maxim that "one seeking equity must do equity and must show 'clean hands' at the threshold." *Udall v. Littell*, 366 F.2d 668, 675 (D.C.Cir.1966), *cert. denied, Littell v. Udall*, 386 U.S. 939, 87 S.Ct. 713, 17 L.Ed.2d 545 (1967). Only recently, Judge Bua of this court pointed out that a court of equity is prevented by the doctrine of unclean hands from granting relief to a wrongdoing plaintiff. He said, "Thus a court may deny equitable relief if the applicant has been guilty of misconduct, fraud or bad faith toward the party against whom relief is sought in connection with the transaction under consideration." *Great Western Cities, Inc. v. Binstein*, 476 F.Supp. 827, 832 (N.D.Ill.1979), *aff'd* 614 F.2d 775 (7th Cir. 1979).

The doctrine of unclean hands is not limited to suits in equity; the general principle it expresses is equally suited to damage actions. *Kuehnert v. Texstar Corp.*, 412 F.2d 700 (5th Cir. 1969). Equitable estoppel applies both in law and in equity to deny a party the right to plead or prove an otherwise important fact in this case, the alleged acts of copyright infringement because of something plaintiff has done or has omitted to do. *Tempo Music, Inc. v. Myers*, 407 F.2d 503, 507 (4th Cir. 1969); 18 Am.Jur.2d, Copyright and Literary Property §§ 26, 27; *Nimmer on Copyrights* § 13.09[B]. In a court-tried case, the reason for invoking the "unclean hands" doctrine to bar an equitable claim applies with equal force to a claim at law for damages. *Urecal Corporation v. Masters*, 413 F.Supp. 873, 876 (N.D.Ill.1976).

Accordingly, these principles of law and equity require that defendant's motion for summary judgment on his copyright misuse defense be granted as to plaintiff's first 21 counts alleging copyright infringement. A copyright owner, like a patentee, who comes into a court of equity seeking relief from alleged infringements is not entitled to recover unless he can show that the misuse in which he has engaged has been purged. *Cf. Berlenbach v. Anderson Thompson Ski Co.*, 329 F.2d 782 (9th Cir. 1964), *cert. denied*, 379 U.S. 830, 85 S.Ct. 60, 13 L.Ed.2d 39 (1964); *Krampe v. Ideal Industries, Inc.*, 347 F.Supp. 1384 (N.D.Ill.1972); *Duplan Corp. v. Deering Milliken, Inc.*, 444 F.Supp. 648 (D.S.C.1977) *aff'd in part*, 594 F.2d 979 (4th Cir. 1979), *cert. denied, Ateliers Roannais de Constructions Textiles v. Duplan Corp.*, 444 U.S. 1015, 100 S.Ct. 666, 62 L.Ed.2d 645 (1980). This does not nullify the copyrights; it merely prevents enforcement of them against the defendant in this case. *See Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.*, 562 F.2d 365, 371 (6th Cir. 1977); *cf. In re Yarn Processing Patent Validity Litigation*, 472 F.Supp. 180 (S.D. Fla.1979).

## VI

Having decided on the disposition by dismissal of the 21 counts which allege copyright infringement, there remain three counts in which plaintiff alleges claims against defendant under the laws of Illinois. Count 22 seeks relief for conduct which defendant committed during pretrial proceedings in this case. It appears that in September 1976 the parties, in open court, agreed to the collection of all the homemade hymnals which plaintiff claims infringed its copyrights. These, according to the plaintiff, were to be delivered to its attorneys. Plaintiff alleges that defendant,

identical with plaintiff's ACL. The object of the conglomeration is to establish an ASCAP type of organization for print licensing of religious songs and hymnals. Unlike ASCAP, this organization would not allow alternative sources of the material vended, as compelled by the consent decrees described in *Broadcast*

*Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 10–12, 99 S.Ct. 1551, 1557, 60 L.Ed.2d 1 (1979), *on remand, Columbia Broadcasting System, Inc. v. American Soc. of Composers, Authors and Publishers*, 607 F.2d 543 (2d Cir. 1979) *and* 620 F.Supp. 930 (2d Cir. 1980).

as the Catholic Archbishop of Chicago, wrote a letter to his parishes, and to all Catholic institutions under his jurisdiction, directing them to remove from their premises the alleged infringing home-made hymnals, together with all of plaintiff's copyrighted works. This action, plaintiff alleges, interfered with the contractual relations it enjoyed through the sale of its ACL to a number of Catholic parishes which had done business with the plaintiff. According to the plaintiff, this conduct constituted interference with prospective economic advantage and was unfair competition, in violation of the common law of Illinois.

Defendant answers this count, admitting that on September 30, 1976 there were proceedings in this court in which the parties agreed that all of the alleged infringing home-made hymnals would be collected. He insists, however, that plaintiff has misread what was said by counsel and has misinterpreted the agreement of the parties. He admits having circulated the letters alleged by the plaintiff; but denies they give rise to the claims being made.

Count 23 seeks to allege a claim of false description or representation as to defendant's goods; that is, the home-made hymnals. It is alleged that defendant has failed to place any copyright notice, acknowledgement of author or composer, the name of the copyright owner, or any indication of reprint permission from the plaintiff in the infringing hymnals. This conduct, plaintiff alleges, constitutes a false designation of origin and a false description or representation of defendant's goods within the meaning of Title 15 U.S.C. § 1125(a). This statute provides that:

"Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or

represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation or origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which the locality is situated, or by any person who believes that he is or is likely to be damaged by the use of such false description or representation."

The affidavits, excerpts from depositions, and exhibits furnished the court by the parties in this summary judgment proceeding show that none of defendant's agents or employees affixed, applied, annexed, or used any false designation of origin on the home-made hymnals.[6] Also, the statute on which plaintiff relies requires that the goods or services to which a false designation of origin is affixed, applied, annexed, or used "enter into commerce." *See Scotch Whiskey Ass'n. v. Barton Distilling Co.*, 489 F.2d 809 (7th Cir. 1973). The facts in this case, as they have been flushed out by discovery, show that all of the home-made hymnals were used in the singing of mass and conduct of religious services within defendant's parishes, all in the state of Illinois.

Count 24, the last one, alleges facts asserting a claim for unfair competition under Illinois law. Plaintiff states that it has expended large amounts of time and money in creating and protecting its copyrighted works; that it has always offered and continues to offer its ACL to churches, schools, and other institutions in defendant's parishes, for a reasonable royalty. Plaintiff asserts that defendant has sought to avoid payment of royalties and compliance with the licensing program initiated by it

---

**6.** In fact, the evidentiary materials submitted in support of the motions for summary judgment clearly show plaintiff will not be able to prove that defendant, personally, as the Catholic Bishop of Chicago, did any of the things about which complaint is made. At most, plaintiff may be able to show that in some of defendant's parishes, priests, and laymen copied some of plaintiff's songs in making the home-made hymnals.

through the ACL. In this way, alleges the plaintiff, it has been damaged by defendant's "deceptive trade practices, unfair competition and misappropriation in this district in violation of common law of the state of Illinois." Defendant has answered and denied the material allegations of these counts.

For adjudication of the claims made, plaintiff invokes the pendent jurisdiction of this court, and relies on 28 U.S.C. § 1338(b) which provides that "[t]he district court shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright ... laws." However, pendent jurisdiction is a doctrine of discretion, not of plaintiff's right, and its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present, a federal court should hesitate to exercise jurisdiction over state claims even though bound to apply state law to them. *Nevills v. State of Illinois*, 388 F.Supp. 622 (E.D.Ill.1974). This court is satisfied that plaintiff has not asserted a claim of unfair competition joined with a substantial and related claim under the copyright laws; and since all of plaintiff's claims for copyright infringement must be dismissed on grant of defendant's motion for summary judgment sustaining the copyright misuse defense, pendent jurisdiction will not be exercised. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Palmer v. Ticcione*, 576 F.2d 459 (2d Cir. 1978), *cert. denied*, 440 U.S. 945, 99 S.Ct. 1421, 59 L.Ed.2d 633 (1979). Accordingly, a judgment order pursuant to Fed.R. Civ.Proc. rule 58, 28 U.S.C., will be entered granting defendant's summary judgment motion and dismissing plaintiff's suit in its entirety.

So ordered.