BASIC BOOKS, INC., Harper & Row
 Publishers, Inc., John Wiley & Sons,
 Inc., McGraw–Hill, Inc., Penguin Books
 USA, Inc., Prentice–Hall, Inc., Richard
 D. Irwin, Inc., and William Morrow &
 Co., Inc., Plaintiffs,

v.

KINKO'S GRAPHICS
CORPORATION, Defendant.

No. 89 Civ. 2807 (CBM).

United States District Court,
S.D. New York.

March 28, 1991.

**1526**

Ronald S. Rauchberg, Charles S. Sims, Herman L. Goldsmith, Jon A. Baumgarten, Proskauer, Rose, Goetz & Mendelsohn, New York City, for plaintiffs.

Dean A. Olds, Jeffery A. Handelman, Thomas A. Schmidt, Kevin J. McDevitt, Willian, Brinks, Olds, Hofer, Gilson & Lione, Chicago, Ill., John S. Siffert, Lankler, Siffert & Wohl, New York City, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

Plaintiffs, all major publishing houses in New York City, brought this suit against Kinko's alleging copyright infringement pursuant to the Copyright Act of 1976. 17 U.S.C. § 101, et seq. More specifically, plaintiffs allege that Kinko's infringed their copyrights when Kinko's copied excerpts from books, whose rights are held by the plaintiffs, without permission and without payment of required fees and sold the copies for a profit. Plaintiffs request relief in the form of statutory damages, injunction, declaratory judgment and attorney's fees and costs.

Kinko's admits that it copied the excerpts in suit without permission, compiled them into course "packets," and sold them to college students. It defends on four grounds. First, Kinko's claims their use of the excerpts was a "fair use," specifically provided for in § 107 of the Copyright Act. Second, Kinko's alleges that plaintiffs misused their copyrights by trying to create an industry standard beyond that established by congressional mandate and which impermissibly precludes all use of plaintiffs' works without permission and royalty. Third, Kinko's claims that plaintiffs are estopped from complaining of the copying because they have known for a long time about Kinko's 20–year practice of selling course packets and did nothing about it and Kinko's detrimentally relied upon their silence. Fourth, Kinko's argues that, with respect to two of the alleged infringements, plaintiffs failed to record their copyrights before filing this complaint and, therefore, this court lacks jurisdiction with respect to those two excerpts.

This court finds and concludes that defendant did violate the Copyright Act, that plaintiffs did not misuse their copyrights nor are they estopped from asserting their rights under the copyrights. With regard to the copyrights that were not recorded before filing the complaint, this court finds them to be validly asserted. Finally, Kinko's has not convincingly shown that the excerpts it appropriated without seeking permission were a fair use of the works in question. This court hereby awards plaintiffs injunctive relief, as well as statutory damages in the amount of $510,000, attorneys fees and costs.

## FINDINGS OF FACT

There are 12 instances of copyright infringement alleged in this case. The 12 excerpts, which vary in length from 14 to 110 pages, were copied from books previously published by the plaintiffs, compiled in five numbered packets ("anthologies") with excerpts from other books and distributed by Kinko's. Kinko's neither sought nor obtained permission to copy any of these works. There are two stores from which Kinko's sold the excerpts included in this suit: one at 24 E. 12th Street (which services, among others, students at New York University and the New School for Social Research) and a second at 2872 Broadway (which services Columbia University students). Below is a list of the 5 packets, by number and title, and a list of the titles of the works copied. Next to the latter title is the total number of pages

copied, the approximate percentage of the entire book that was copied and whether the work was in- or out-of print.

### PACKET # 1: "WORK AND COMMUNITY". (PX 16)

This packet included 388 pages of copied work[1] taken from 25 books. This course was taught at the New School for Social Research by Professor Hoffman; 3 students were enrolled. This packet was sold for $24.00: $21.75 for copying and $2.25 for binding.

1. *Understanding Capitalism* (PX 5) 22 pp. [5%], in-print, by Samuel Bowles & Richard Edwards.

Pages 62–83 (all of chapter 4) of this 15–chapter book was copied. The book has 419 pages of text in addition to 11 pages of introductory material. It was published in 1985. The amount copied which encompasses an entire chapter of Bowles and Edwards' relatively recent book weighs against defendant.[2]

2. *Community: A Critical Response* (PX 4) 23pp. [18–21%], out-of-print, by Joseph Gusfield.

Pages 1–22 (all of chapter 1) of this 4–chapter book was copied. The book is 120 pages. The soft-cover version exhibited at trial has a price of $3.95. The book was published in 1975. This book was out-of-print and is relatively old, however, the amount copied weighs heavily against defendant.

3. *Work and Community in the West* (PX 2) 34pp. [22–24%], out-of-print. An anthology with contributions from six authors, edited by Edward Shorter.

Pages 1–33 (chapter 1) of this 6–chapter book was copied. The book totals 146 pages. The soft-cover version exhibited at trial has a price of $2.95. It was published in 1973. This book was out-of-print and is

relatively old, however, the amount copied weighs heavily against defendant.

4. *The Deindustrialization of America* (PX 1) 53pp. [16–20%], in-print, by Barry Bluestone & Bennett Harrison.

Pages 3–21 (chapter 1) and pages 231–64 (chapter 8) were copied from this 8–chapter book. The book is 323 pages. The book was published in 1982. The amount copied weighs against defendant.

5. *All Our Kin: Strategies for Survival in a Black Community* (PX 3); 14pp. [8–11%], in-print, by Carol Stack.

This book has 175 pages in addition to 21 pages of introductory material. The pages copied were pages 32–45, one of the 8 chapters in the book. The exhibited copy of the hardcover book has a price of $7.95. It was published in 1974. The amount copied weighs against defendant.

6. *A Lesser Life* (PX 12) 37pp. [8–9%], in-print, by Sylvia Ann Hewlett.

Pages 11–47 of this book were copied; they include the Introduction and one additional chapter. The book has 461 pages. The exhibited hardcopy has a price of $17.95. It was published in 1986. The amount copied weighs against defendant.

### PACKET # 7: "ART THERAPY WITH GROUPS". (PX 15)

This packet included 383 pages taken from 43 sources. The course was taught at New York University by Professor Haeseler; 10 students were enrolled. This packet sold for $20.07.

7. *Group Dynamics: The Psychology of Small Group Behavior* (PX 8) 40pp. [7–8%], in-print, by Marvin Shaw.

Kinko's copied the following pages from this book: pages 1–17 (chapter 1), 342–45,

---

1. Kinko's uses double-sided pages. This means that, in this instance, Kinko's used 194 pages of copy paper to reproduce 388 pages of material. In this instance, as well as most others involved, Kinko's was also able to copy 2 pages of copyrighted material *per side* of paper. Therefore, for example, 10 pages of copy paper could po-

tentially infringe 40 pages of copyrighted material.

2. This assessment is based upon the amount and substantiality factor in fair use analysis, *see infra.*

224, 225, 238–39, 256–61, and pages 306–13 of this 531–page book. The book has 12 chapters. It was published in 1971. The amount copied weighs against defendant.

8. *Art Psychotherapy* (PX 7) 20pp. [6%], in-print, by Harriet Wadeson.

Pages 236–55 were copied (less than half of chapter 19 of this book). The book is 352 pages in addition to 23 pages of introductory material. The soft-cover version exhibited at trial has a price of $17.95. This book was published in 1980. The amount copied weighs against defendant.

PACKET # 34: untitled. (PX 18)

This packet includes 324 pages taken from 23 sources. This course was taught at Columbia University by Professor Ichniowski. Thirty-three students were enrolled. This packet was sold for $21.50: $16.98 for copying, $1.50 for binding, and $1.50 for royalty payment.

9. *Business Ethics* (PX 10) 22pp. [14%], in-print, by Norman Bowie.

Pages 17–38 (all of chapter 2) of this book were copied. The book has 7 chapters, 159 pages of text and index, and 13 pages of introductory material. This book was published in 1982. The amount copied weighs against defendant.

PACKET # 36: "INTERNATIONAL AFFAIRS". (PX 19)

This packet included 292 pages taken from 22 sources. This course was taught at Columbia University by Professor Lissakers; 48 students were enrolled. The packet sold for $17.75: $14.90 for copying, and $1.50 for binding.

10. *The Money Market* (PX 11) 100pp. [13–14%], in-print, by Marcia Stigum.

This book contains 728 pages of text (20 chapters) and 23 pages of introductory material. Pages 7–43 and 129–191 of the book were copied. This represented chapters 2, 3 and 6. This book was published in 1978 and reprinted in 1983. The amount copied weighs against defendant.

11. *The Money Bazaars* (PX 9) 65pp. [17–18%], out-of-print, by Marvin Mayer.

Pages 177–241 were copied. The pages covered Chapters 7 and 8, and part of 9. The 12 chapters and index in the book total 376 pages. The paperback book sells for $4.95. It was published in 1984. The amount copied, despite the fact that this book was out-of-print, weighs heavily against defendant.

PACKET # 70: "U.S. SINCE 1945". (PX 17)

This packet included copies of 212 pages of materials taken from 7 sources. This course was taught by Professor Freeman at Columbia University. It enrolled 132 students. This packet was sold for $11.00: $8.66 for copying, and $1.50 for binding.[3]

12. *Lyndon Johnson and the American Dream* (PX 6), 110pp. [25–28%], in-print, out-of-stock, by Doris Kearns.

Chapters 7, 8 and 10 of this 12–chapter book were copied. The pages copied were 177–219, 220–62, and 300–23. The book has over 400 pages, including preface, prologue, epilogue, author's postscript, endnotes, and index. It was published in 1976. The amount copied weighs heavily against defendant, despite the fact that the book was out-of-stock.

Each packet has a cover page, printed with the Kinko's logo, "Kinko's Copies: Professor Publishing," the name of the course and professor, the designated packet number, and a price listing. There is a space on the price listing to designate the royalty charges included. Only one packet lists a charge for royalty fees. On the inside cover of three of the five packets is a sheet entitled "Education and Fair Use: The Federal Copyright Law." It lists the § 107 fair use factors and displays the Professor Publishing logo and course information. None of the excerpts carries a copyright creditline as required by copyright law.

It is undisputed that Kinko's markets and provides its copying services directly to university professors and students. At tri-

3. These charges, which do not add up correctly, are reflected as on the packet itself.

al, Kinko's presented marketing brochures produced by the company which are distributed by their marketing representatives to university professors and used as the subject of follow-up visits. These brochures openly solicit from the professors lists of readings they plan to use in their courses. Kinko's then copies excerpts, some quite large, and sells them in bound form with excerpts copied from other books as well. Unaudited financial statements of Kinko's Graphics Corporation for the years 1988 and 1989 show revenue of $42 million and $54 million, respectively, and net profit of $200,000 and $3 million, respectively. Its assets totalled $12 million in 1988 and $15 million in 1989. (PX 25a). Appropriately, plaintiffs refer to this bound packet as an "anthology."[4] Plaintiffs derive a significant part of their income from textbook sales and permissions fees. Kinko's has conducted its Professor Publishing business at least since the mid–1980's.

## DISCUSSION

### I. FAIR USE.

Coined as an "equitable rule of reason," the fair use doctrine has existed for as long as the copyright law. It was codified in § 107 of the Copyright Act of 1976, Article 17 of the United States Code. The Section reads in its entirety:

> Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, *for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research,* is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107 (1976) (emphasis added).

The codification was intended to "restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way." H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 66 (1976); S.Rep. No. 94–473, 94th Cong., 1st Sess. 62 (1975), U.S.Code Cong. & Admin.News 1976, pp. 5659, 5680. Therefore, thorough analysis of the caselaw is necessary.

For almost 300 years, American law has protected intellectual property rights through the copyright law. The protection derives from the English Statute of Anne (8 Anne c. 19, 1710), the first statute to recognize the rights of authors. Section 106 of the 1976 Copyright Act provides that "[s]ubject to Section[ ] 107 ... the owner of copyright under this title has the exclusive rights ... to reproduce the copyrighted work." 17 U.S.C. § 106. In *Folsum v. Marsh*, 9 F.Cas. 342 (C.C.D.Mass. 1841) (No. 4901), Justice Story set forth the meaning of fair use to which we adhere today. "In short, we must often ... look to the nature and objects of the selections made, the quantity and value of the materials used, and the degree in which the use may prejudice the sale, or diminish the profits, or supersede the objects, of the original work." *Id.* at 348.

Fair use more currently has been defined as the "privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner...." *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303, 306 (2d Cir.1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967). The copyright law, through the fair

---

**4.** An anthology, according to Webster's Third New International Dictionary (unabridged), is a "representative collection of selected literary pieces or passages or of selected pieces in any art form." (1967)

use doctrine, has promoted the goal of encouraging creative expression and integrity by ensuring that those who produce intellectual works may benefit from them. *See Iowa State University Research Foundation, Inc. v. American Broadcasting Cos., Inc.*, 621 F.2d 57, 60 (2d Cir.1980).

Courts and commentators disagree on the interpretation and application of the four factors, topics of current debate. *See, e.g.,* Leval, *Toward A Fair Use Standard*, 103 Harv.L.Rev. 1105 (1990); Weinreb, *Fair's Fair: A Comment on the Fair Use Doctrine*, 103 Harv.L.Rev. 1137 (1990); Fisher, *Reconstructing the Fair Use Doctrine*, 101 Harv.L.Rev. 1661 (1988). The search for a coherent, predictable interpretation applicable to all cases remains elusive. This is so particularly because any common law interpretation proceeds on a case-by-case basis. The two Supreme Court precedents on the issue of fair use, *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) and *Harper & Row v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), were both overturned at each level of review.

■ This case is distinctive in many respects from those which have come before it. It involves multiple copying. The copying was conducted by a commercial enterprise which claims an educational purpose for the materials. The copying was just that—copying—and did not "transform" the works in suit, that is, interpret them or add any value to the material copied, as would a biographer's or critic's use of a copyrighted quotation or excerpt. Because plaintiffs specifically allege violation of both, this court has the task of evaluating the copying under fair use doctrine and the "Agreement on Guidelines for Classroom Copying in Not–For–Profit Educational Institutions" ("Classroom Guidelines").

## A. The 4 Factors of Fair Use.

1. *Purpose and Character of the Use.*

■ Section 107 specifically provides that under this factor we consider "whether [the] use is of a commercial nature or is for *nonprofit* educational purposes." 17

U.S.C. § 107; *see also Marcus v. Rowley*, 695 F.2d 1171, 1175 (9th Cir.1983). The Supreme Court has held that "commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony Corp.*, 464 U.S. at 451, 104 S.Ct. at 793. Additionally, the Supreme Court has found that "the distinction between 'productive' and 'unproductive' uses may be helpful in calibrating the balance [of interests]." *Id.* at 455 n. 40, 104 S.Ct. at 795 n. 40. While both are significant considerations, neither of these is determinative.

### Transformative use.

It has been argued that the essence of "character and purpose" is the transformative value, that is, productive use, of the secondary work compared to the original. District Court Judge Leval has noted that, "[t]he use ... must employ the quoted matter in a different manner or for a different purpose from the original. A quotation of copyrighted material that merely repackages or republishes the original is unlikely to pass the test." Leval, *Toward a Fair Use Standard*, 103 Harv.L.Rev. 1105, 1111 (1990) (suggesting a balancing between the justification for and the extent of the taking). Kinko's work cannot be categorized as anything other than a mere repackaging.

Most contested instances of copyright infringement are those in which the infringer has copied small portions, quotations or excerpts of works and represents them in another form, for example, a biography, criticism, news article or other commentary. *See, e.g., Harper & Row v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *New Era Publications v. Carol Publishing*, 904 F.2d 152 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 297, 112 L.Ed.2d 251 (1990); *Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir.), *cert. denied*, 484 U.S. 890, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987); *Wright v. Warner Books, Inc.*, 748 F.Supp. 105 (S.D.N.Y. 1990). In this case, there was absolutely no literary effort made by Kinko's to ex-

pand upon or contextualize the materials copied. *See Pacific & Southern Co. v. Duncan,* 744 F.2d 1490, 1496 (11th Cir.), *cert. denied,* 471 U.S. 1004, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985) (finding infringement by a defendant who neither "analyze[d] . . . [nor] improve[d]" the work, noting that "the preamble to Section 107 indicate[s] [that] fair uses are those that contribute in some way to the public welfare.").[5] The excerpts in suit were merely copied, bound into a new form, and sold. The plaintiffs refer to this process as "anthologizing." The copying in suit had productive value only to the extent that it put an entire semester's resources in one bound volume for students. It required the judgment of the professors to compile it, though none of Kinko's.

*Commercial use.*

The use of the Kinko's packets, in the hands of the students, was no doubt educational. However, the use in the hands of Kinko's employees is commercial. Kinko's claims that its copying was educational and, therefore, qualifies as a fair use. Kinko's fails to persuade us of this distinction.

Kinko's has not disputed that it receives a profit component from the revenue it collects for its anthologies. The amount of that profit is unclear[6]; however, we need only find that Kinko's had the intention of making profits. Its Professor Publishing promotional materials clearly indicate that Kinko's recognized and sought a segment of a profitable market, admitting that "[t]remendous sales and profit potential

arise from this program." Kinko's Policies and Procedures Manual, chapter 9, at 1 (PX 11) (further noting that "[t]hese orders can be the easiest to run, and the most profitable." *Id.*).

Although Kinko's tries to impress this court with its purportedly altruistic motives, the facts show that Kinko's copying had "the *intended purpose* of supplanting the copyright holder's commercially valuable right." *See Harper & Row,* 471 U.S. at 562, 105 S.Ct. at 2231 (original emphasis). Kinko's promotional literature compares its "prompt" service to the "ineffectiveness of traditional publishing to meet the changing needs of faculty and students." "The Professor Publishing Newsletter, Fall 1984" (DTX C–D).

In *Pacific & Southern Co. v. Duncan, supra,* the Eleventh Circuit denied the fair use defense to a company which videotaped and sold copyrighted portions of a television news show to the featured subject. Noting that "every commercial exchange of goods and services involves both the giving of the good or service and the taking of the purchase price," the court found character and use against the defendant since "[t]he fact that TV News Clips focuses on the giving rather than the taking cannot hide the fact that profit is its primary motive for making the exchange." *Id.* at 1496. The same holds true for Kinko's.

Kinko's offers a 10% discount if professors get in their orders early, emphasizes

---

**5.** *But see* Weinreb, *Fair's Fair: A Comment on the Fair Use Doctrine,* 103 Harv.L.Rev. 1137, 1143 (1990) (arguing that the usefulness of "transformative" value as a criterion is overstated and posits that "[a] use may serve an important, socially useful purpose without being transformative, simply by making the copied material available.").

He further states:
One may wonder whether the publication of material in a new "package" may not itself constitute a transformative use. For example, the publication of a volume of Salinger's letters would have a purpose entirely different from that which prompted Salinger to write and send the letters contained in the volume. Preparing the collection involves effort and, perhaps, judgment of a kind that often is enough to sustain a copyright.

*Id.* at 1143, n. 29. He rejects Judge Leval's emphasis of transformative use as nothing more than a "limiting test, apt for uses that demonstrably serve neither a public purpose nor a socially recognized private purpose" which limits its evaluation of other relevant factors. *Id.* at 1144. The effort utilized in this case was questionable at best and the level of judgment practically non-existent.

**6.** This is true because Kinko's financial statements do not break out the Professor Publishing segment of the business apart from its other revenues. However, the statements show that the company made a substantial profit in 1988 and 1989, respectively: $27 million and $35 million gross profit (before operating expenses) and $200,000 and $3 million net profit. (PX 25a).

student savings, convenience, and service—all "at no cost to your department." Kinko's shows that it is keenly aware of students' and professors' preoccupation with educational costs and provides additional services to get their business: offering campus pick-up and delivery and free copyright permission assistance. *See* "Campus Rep Marketing Materials 1988" (PX 17). The extent of its insistence that theirs are educational concerns and not profitmaking ones boggles the mind.

Kinko's has periodically asserted that it acted at the instruction of the educational institution, that is, as the agent of the colleges and is without responsibility. Yet, Kinko's promotional materials belie this contention particularly because Kinko's takes responsibility for obtaining copyright permission while touting the expertise of its copyright permissions staff (a "service [which] is provided at no charge to all Kinko's customers."). "Copyright Information Letter to Faculty Members," in Kinko's Copyright and Professor Publishing Handbook, at 40.

Kinko's is paid directly by students who come into its stores to purchase the packets. Professors do not pay a fee; in fact, Kinko's provides incentives to professors for choosing their copy center over others. *See* "Kinko's Copyright and Professor Publishing Handbook" (1988) (as advice on how to avoid delays, the manual suggests that employees "[o]ffer an incentive or discount to professors who submit their materials to Kinko's several weeks before classes start." *Id.* at 8.); *id.* at 42 (Kinko's Sales Call Follow Up letter which is sent by campus representatives reads, "I have enclosed your Kinko's Faculty Club card, which entitles you to a 10% discount on all goods and services at any Kinko's nationwide.").

While financial gain "will not preclude [the] use from being a fair use," *New York Times Co. v. Roxbury Data Interface, Inc.*, 434 F.Supp. 217, 221 (D.N.J.1977), consideration of the commercial use is an important one.

"The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562, 105 S.Ct. at 2231. This is precisely the concern here and why this factor weighs so strongly in favor of plaintiffs.

Courts' consideration of the profit factor usually arises because the alleged infringing work competes in the same market as the copyrighted work, thus making the "commerciality" more harmful to the copyright holder. *See Marcus v. Rowley*, 695 F.2d at 1175; *Haberman v. Hustler Magazine, Inc.*, 626 F.Supp. 201, 211 (D.Mass.1986). In cases in which a defendant is claiming fair use for a criticism, commentary or other scholarly research, the courts are more likely to find fair use under this factor. In *New Era Publications v. Carol Publishing*, 904 F.2d at 156, the Second Circuit found fair use under the character and use factor since the publication in suit was not an economic exploitation of the original work but a legitimate critical biography. In that case, a critic and biographer of L. Ron Hubbard and the Church of Scientology defended his use of quotes from 48 of Hubbard's works.

A potentially widespread use which was notably non-commercial has been held to be a fair use. In *Sony Corp. v. Universal City Studios*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), television viewers taped plaintiffs' television programs on home video recorders, doing nothing to enhance the program—simply copying them in order to view them later. The Court decided this "time-shifting" was fair use and placed emphasis on the fact that the viewers were not selling their copies of these programs for profit. *Id.* at 454–55, 104 S.Ct. at 795.

### 2. The Nature of the Copyrighted Work.

The second factor concerns the nature of the copyrighted work. Courts generally hold that "the scope of fair use is greater with respect to factual than non-factual works." *New Era Publications v. Carol Publishing Group*, 904 F.2d at 157. Fac-

tual works, such as biographies, reviews, criticism and commentary, are believed to have a greater public value and, therefore, uses of them may be better tolerated by the copyright law. *See Salinger v. Random House, Inc.,* 811 F.2d at 96. Works containing information in the public interest may require less protection. *See Consumers Union v. General Signal Corp.,* 724 F.2d 1044, 1049 (2d Cir.1983), *cert. denied,* 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). Fictional works, on the other hand, are often based closely on the author's subjective impressions and, therefore, require more protection. These are general rules of thumb. The books infringed in suit were factual in nature. This factor weighs in favor of defendant.

### 3. *The Amount and Substantiality of the Portion Used.*

 "There are no absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use." *Maxtone–Graham v. Burtchaell,* 803 F.2d 1253 (2d Cir.), *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987). This third factor considers not only the percentage of the original used but also the "substantiality" of that portion to the whole of the work; that is, courts must evaluate the qualitative aspects as well as the quantity of material copied. *See New Era Publications Int'l v. Carol Publishing Group,* 904 F.2d at 158. A short piece which is "the heart of" a work may not be fair use and a longer piece which is pedestrian in nature may be fair use. The balancing of the four factors must be complete, relying solely upon no one factor. The purpose of the use may be balanced against the amount and substantiality of the use. For example, "[e]ven substantial quotations might qualify as fair use in a review of a published work." *See Harper & Row,* 471 U.S. at 564–65, 105 S.Ct. at 2232–33.

Courts have found relatively small quantitative uses to be fair use. *See, e.g., New Era Publications,* 904 F.2d at 158 (court found as fair that defendant used a "minuscule" amount of 25 works: 5–6% of 12 works, 8% or more of 11 works "each of the 11 being only a few pages in length.");

*Iowa State University Research Found., Inc. v. Am. Broadcasting Cos., Inc.,* 621 F.2d at 61–62 (court found unfair copying of 8% of videotape never before broadcast); *Maxtone–Graham,* 803 F.2d at 1263 (inclusion of 4.3% of work was fair); *Salinger,* 811 F.2d at 98–99 (finding this factor weighed "heavily" in favor of Salinger, the court found no fair use of quotation and paraphrasing totalling one-third of 17 letters, and 10% of 42 letters); *Harper & Row,* 471 U.S. at 564–65, 105 S.Ct. at 2232–33 (the 300 copyrighted words appropriated to the Times article were an insubstantial portion of the work but " 'essentially the heart of the book.' ").

Additionally, "reference to a work's availability is appropriate." *Wright v. Warner Books, Inc.,* 748 F.Supp. at 112. Therefore, longer portions copied from an out-of-print book may be fair use because the book is no longer available. (This has been thought to be true because, presumably, there is little market effect produced by the copying. However, plaintiffs in this case convincingly argue that damage to out-of-print works may in fact be greater since permissions fees may be the only income for authors and copyright owners.)

This court finds and concludes that the portions copied were critical parts of the books copied, since that is the likely reason the college professors used them in their classes. *cf. Harper & Row,* 471 U.S. at 565, 105 S.Ct. at 2233 ("the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material."). While it may be impossible to determine, as the Court did in *Harper & Row,* that the quoted material was "essentially the heart of" the copyrighted material, *Id.* at 565, 105 S.Ct. at 2233, it may be inferred that they were important parts.

This factor, amount and substantiality of the portions appropriated, weighs against defendant. In this case, the passages copied ranged from 14 to 110 pages, representing 5.2% to 25.1% of the works. *See* Findings of Fact, *supra,* for discussion of amount copied. In one case Kinko's copied 110 pages of someone's work and sold it to

132 students. Even for an out-of-print book, this amount is grossly out of line with accepted fair use principles.

In almost every case, defendant copied at least an entire chapter of a plaintiff's book. This is substantial because they are obviously meant to stand alone, that is, as a complete representation of the concept explored in the chapter. This indicates that these excerpts are not material supplemental to the assigned course material but *the* assignment. Therefore, the excerpts, in addition to being quantitatively substantial, are qualitatively significant.

### 4. The Effect of the Use on Potential Markets for or Value of the Copyrighted Work.

The fourth factor, market effect, also fails the defendant. This factor has been held to be "undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566, 105 S.Ct. at 2233. "To negate fair use one need only show that if the challenged use 'should become widespread, it would adversely affect the *potential* market for the copyrighted work.'" *Id.* at 568, 105 S.Ct. at 2234 (quoting *Sony Corp.*, 464 U.S. at 451, 104 S.Ct. at 793, emphasis added).

Kinko's confirms that it has 200 stores nationwide, servicing hundreds of colleges and universities which enroll thousands of students. The potential for widespread copyright infringement by defendant and other commercial copiers is great. In this case, Kinko's has admitted[7] that its market for these anthologies or packets is college students. The packets were compiled as a result of orders placed by professors at Columbia University, New York University and the New School for Social Research as to what readings they needed to supply their courses.[8] In this case, the competition for "student dollars" is easily won by Kinko's which produced 300 to 400–page packets including substantial portions of copyrighted books at a cost of $24 to the student. Packet # 34 contained excerpts from 20 different books, totalled 324 pages, and cost $21.50. (PX 18). While it is possible that reading the packets whets the appetite of students for more information from the authors, it is more likely that purchase of the packets obviates purchase of the full texts. This court has found that plaintiffs derive a significant part of their income from textbook sales and permissions. This court further finds that Kinko's copying unfavorably impacts upon plaintiffs' sales of their books and collections of permissions fees. This impact is more powerfully felt by authors and copyright owners of the out-of-print books, for whom permissions fees constitute a significant source of income. This factor weighs heavily against defendant.

### 5. Other Factors.

In this case an important additional factor is the fact that defendant has effectively created a new nationwide business allied to the publishing industry by usurping plaintiffs' copyrights and profits. This cannot be sustained by this court as its result is complete frustration of the intent of the copyright law which has been the protection of intellectual property and, more importantly, the encouragement of creative expression. Because of the vastness and transitory nature of its business (Kinko's has 200 stores nationwide which are typically located near colleges), it has become difficult for plaintiffs to challenge defendant.

---

**7.** In Defendant's Proposed Findings of Fact, Kinko's admits that:

> As part of its service to the educational community, Kinko's operates a program identified as "Professor Publishing." Under the Professor Publishing program, Kinko's photocopies excerpts of selected materials at the request of college professors and teachers for educational use in the classroom. Kinko's has been operating its Professor Publishing program for nearly 20 years.

Defendant's Proposed Findings of Fact, at 2.

**8.** "Instead of reproducing the material himself or herself and distributing it to the class, the professor brings the material to Kinko's or has it picked up. Kinko's then photocopies the material ... and sells it directly to the students...." The professor is the one to determine which materials will be copied. Defendant's Proposed Findings of Fact, ¶¶ 4, 6, and 9.

Additionally, the Classroom Guidelines express a specific prohibition of anthologies. The fact that these excerpts were compiled and sold in anthologies weighs against defendant.

■ Kinko's claims that "[t]he evidence shows that course packets are of tremendous importance to teaching and learning, and are the subject of widespread and extensive use in schools throughout the country" and that "[a]n injunction against the educational photocopying at issue would pose a serious threat to teaching and the welfare of education." Defendant's Proposed Conclusions of Law, at 23. This appears to be a "fair use by reason of necessity" argument. Kinko's has failed to prove this central contention which is that enjoining them from pirating plaintiffs' copyrights would halt the educational process.

Kinko's did not produce any professor to testify that he or she uses course packets and would be disabled from teaching effectively if Kinko's could not copy without paying permissions fees. Defendant did produce a witness, Dr. Bruce Johnson, who testified to the results of a survey he conducted which showed the widespread use of course packets by college professors and the reasons for this use.[9] (DTX L–Z). Notwithstanding professors' complaints of costly original materials, rapid change in course subject matter, and inadequate current offerings—which are all good reasons for desiring anthologies—defendant's witnesses did not produce evidence which would explain why they could not seek and pay for permission to create these antholo-

gies. Dr. Johnson's survey fails to do so. This argument also fails.

### B. The Classroom Guidelines.

The Classroom Guidelines, entitled the "Agreement on Guidelines for Classroom Copying in Not–For–Profit Educational Institutions," are a part of the legislative history of the Copyright Act of 1976. H.R. Rep. No. 1476, 94th Cong., 2d Sess. 68 (1976). These Guidelines were the result of negotiation and agreement among the Ad Hoc Committee of Educational Institutions and Organizations on Copyright Law Revision, the Authors League of America, Inc., and the Association of American Publishers.[10] *Id.* at 67. One commentator confirms the Guidelines as an act of compromise which "was necessitated by the widespread availability of reprographic technology which eliminated much of the copyright owner's control over the reproduction of his work." Patry, *The Fair Use Privilege in Copyright Law* at viii (1985). The legislative history acknowledges "the long controversy over the related problems of fair use and the reproduction (mostly by photocopying) of copyrighted material for educational and scholarly purposes." House Report, at 66, U.S.Code Cong. & Admin.News 1976, p. 5679. This indicates that Congress saw the maelstrom beginning to churn and sought to clarify, through broad mandate, its intentions.

■ For a proper analysis, there must be initial consideration given to the issue of what comprises educational copying and whether Kinko's status as a for-profit corporation, and its profitmaking intent, ren-

---

**9.** This telephone survey of 81 faculty members at the University of California, Santa Barbara, was conducted in August 1990. It showed that: 52% of the total provided "customized" packets for their students; 98% of them did so because there was no adequate book available; 29% did so because it would be too costly for students to buy all of the sources; and 95% did so because they claimed their field was changing rapidly and they needed up-to-date materials. "Survey of University Professors Regarding Customized Packages" at 15, Economic Analysis Corporation (1990).

**10.** There was testimony introduced at trial by Professor Peter Jaszi that the Guidelines was no compromise but in fact a concession forced on educators. Tr. 837–39. This testimony was admitted but, for the reasons stated here, this court places limited reliance on it. This is a likely claim by any party to a compromise. A compromise is just that, one side gives up some of its demands in exchange for concessions of the other party. This court is in no position to retrospectively evaluate the quality of debate and parsing of privileges and responsibilities during Congress' or these groups' deliberations. The congressional record must speak for itself.

ders it outside of a Guidelines review. We believe that it does.

Kinko's contends that it serves an important function in the educational process—providing prompt, cost-effective service to educational institutions. If they did not provide this service to colleges and universities, they claim, these institutions and their students would suffer educationally and financially. However, Kinko's is *in the business* of providing copying services for whomever is willing to pay for them and, as evidenced in this case, students of colleges and universities are willing to pay for them.

This commercial copying can be contrasted to library copying. In *Williams & Wilkins Co. v. United States*, 487 F.2d 1345, 203 Ct.Cl. 74, *aff'd*, 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264 (1975), the court found library copying to be a fair use. In that case, the Department of Health, Education and Welfare, through the National Institutes of Health (NIH) and the National Library of Medicine (NLM) copied articles from medical journals and disseminated them to researchers and personnel who requested them. The libraries established rules regarding page limitations, frequency and number of copies, and they did not charge a copying fee. *See id.* at 1347–49. The NLM reproduced each copy with a statement saying: " 'This is a single photostatic copy made by the National Library of Medicine for purposes of study or research in lieu of lending the original.' " 487 F.2d at 1348. Classroom and library copying are viewed more sympathetically "since they generally involve no commercial exploitation and ... [have] socially useful objectives.... [T]his is not true of photocopy shops, which reproduce for profit." Nimmer, § 13.05[E], at 13–93—13–94, & n. 69.

■ This court finds and concludes that even if Kinko's copying warranted review under the Classroom Guidelines, it is excessive and in violation of the Guidelines requirements.[11]

There is dispute as to whether the Guidelines represent a maximum or minimum of allowable copying. The Guidelines assert its intended meaning thusly: "[t]he purpose of the following guidelines is to state the minimum and not the maximum standards of educational fair use under Section 107 of H.R. 2223." *Id.* at 68. The Guidelines clearly state that notwithstanding their promulgation, fair use standards may be more or less permissive [12]—depending upon the circumstances and based upon equitable considerations. *See also* Nimmer, § 13.05[E], at 13–96 (courts may decide whether a use which exceeds the Guidelines may be fair use *and* whether a use which is within the Guidelines may exceed fair use; courts must balance the interests involved). This court finds that the copying in suit clearly deviates from the letter and spirit of the Guidelines.

Under the section "Multiple Copies for Classroom Use," the stated premise is that "[m]ultiple copies (not to exceed in any event more than one copy per pupil in a course) may be made by or for the teacher giving the course for classroom use or discussion...." H.R.Rep. No. 1476, at 68 (emphasis supplied), U.S.Code Cong. & Admin.News 1976, p. 5682.[13] The Guidelines provide that a teacher may make multiple copies of copyrighted material if the copying meets the tests of brevity, spontaneity, and cumulative effect and so long as "each copy includes a notice of copyright." *Id.* at 68, U.S.Code Cong. & Admin.News 1976, p. 5682. It has already been found that Kin-

---

**11.** We have evaluated Kinko's acts pursuant to Guidelines requirements because we find the circumstance of copying for college students to be particularly compelling in this case, even though Kinko's is not a teacher or other educational institution and we have found no agency relationship between Kinko's and the college professors involved. *See* agency discussion *infra*.

**12.** "There may be instances in which copying which does not fall within the guidelines stated below may nonetheless be permitted under the criteria of fair use." H.R.Rep. No. 1476, at 68, U.S.Code Cong. & Admin.News 1976, p. 5681.

**13.** Expressly, the decision of this court does not consider copying performed by students, libraries, nor on-campus copyshops, whether conducted for-profit or not.

ko's failed to include copyright notices on any of the works in suit.

Brevity, in prose, is defined as "a complete article, story or essay of less than 2,500 words," or an excerpt of "not more than 1,000 words or 10% of the work, whichever is less." *Id.* Defendant does not meet this requirement.

Spontaneity requires that "the inspiration and decision to use the work and the moment of its use for maximum teaching effectiveness [be] so close in time that it would be unreasonable to expect a timely reply to a request for permission." *Id.* at 69, U.S.Code Cong. & Admin.News 1976, p. 5682. Because Kinko's copying coincided with the start of each semester and was prompted by Kinko's obtaining a list of course materials from professors, we find that the copying in suit cannot be considered spontaneous. The anthologies were created to last the full semester, or at least for several weeks, since they averaged 200 to 400 pages per course packet.

Additionally, while it is true that modern teaching methods present copyright dilemmas by requiring frequent updating of information from varied sources, the excerpts in suit were not copied from current publications. The most recent publication date among the books in suit was 1985.

Cumulative effect proscribes any more than "nine instances of multiple copying for one course during one class term," limits the copied material to one course only, and to no more than one piece of work per author. House Report, at 69, U.S.Code Cong. & Admin.News 1976, p. 5683. Defendants fail this requirement. Of the five course packets containing 7, 22, 23, 25, and 43 instances of multiple copying, four of them clearly exceed the nine permissible instances.

■ *Anthologies.* In addition to these tests, most of which defendant has failed, Kinko's conduct appears to violate a specific mandate of the Classroom Guidelines:

III. *Prohibitions as to I and II Above.* Notwithstanding any of the above, the following shall be prohibited:

(A) *Copying shall not be used to create or to replace or substitute for anthologies, compilations or collective works....*

(C) Copying shall not: (a) substitute for the purchase of books, publishers' reprints or periodicals.

(D) No charge shall be made to the student beyond the actual cost of the photocopying.

*Id.* at 69–70 (emphasis added), U.S.Code Cong. & Admin.News 1976, p. 5683. Plaintiffs argue that, notwithstanding the "safe harbor" provided in the spontaneity, brevity and cumulative effect requirements of Parts I and II, Part III of the Guidelines "flatly and unequivocally prohibit[s]" copying of the sort in suit. Plaintiffs' Post–Trial Memorandum of Law, at 21 ["Plaintiffs' Post–Trial Memo"]. Defendant urges the court to seek a less rigid view of the meaning of the Guidelines. We are convinced that this is the more prudent path than a bright line pronouncement and refuse to hold that all unconsented anthologies are prohibited without a fair use analysis. However, the fact that these excerpts were placed in anthologies weighs significantly against defendant.[14]

Lastly, plaintiffs argue that "even without examining the Classroom Guidelines, § 107, itself, read in the light of the legislative history, clearly renders unauthorized anthologizing (especially when undertaken for profit) outside the bounds of fair use." Plaintiffs' Post–Trial Memo, at 21. This court is not prepared to so hold. While we agree that Congress did manifest a specific apprehension of the use of anthologies, it is not clear that Congress intended strict application of this prohibition without fair use balancing.

## II. COPYRIGHT MISUSE AND UNCLEAN HANDS.

Kinko's alleges that the plaintiff publishers have collectively attempted to "impede

14. The 1966 House Report noted: "education is the textbook publishers' only market, and ... many authors receive their main income from licensing reprints in anthologies and textbooks; if an unlimited number of teachers could prepare and reproduce their own anthologies, the cumulative effect would be disastrous." H.R. Rep. No. 2237, 89th Cong., 2d Sess. at 62 (1966).

and prohibit educational copying for classroom use as carried out by Kinko's on behalf of professors" and have "combined with each other to promulgate as a purported 'industry standard' with respect to photocopying a version of 'fair use' that is inimical to Section 107 of the Copyright Act as enacted by Congress." Defendant's Proposed Conclusions of Law, at 34–35. The defense of copyright misuse through violation of the antitrust laws has generally been held not to exist. *See* Nimmer, § 13.09[A], at 13–142.1—13–143; *see also Orth–O–Vision, Inc. v. Home Box Office,* 474 F.Supp. 672, 686 (S.D.N.Y.1979) (violation of antitrust laws is no defense to copyright infringement); *Peter Pan Fabrics, Inc. v. Candy Frocks, Inc.,* 187 F.Supp. 334, 336 (S.D.N.Y.1960) (same).

In many cases, the claim has been recognized but not upheld. *See, e.g., Supermarket of Homes, et. al. v. San Fernando Valley Board of Regents,* 786 F.2d 1400 (9th Cir.1986) (allegedly discriminatory conduct failed to establish copyright misuse); *Broadcast Music, Inc. v. CBS,* [1983–2] Trade Cas. (CCH) ¶ 65,551, 1983 WL 1136 (S.D.N.Y.1983) (copyright misuse defense is unlikely to succeed on the merits).

However, some courts have held that "misuse of a copyright, in violation of the antitrust laws, may be asserted as a defense in copyright infringement cases." *United Telephone Co. of Missouri v. Johnson Pub. Co.,* 855 F.2d 604, 611 (8th Cir. 1988). The defense of patent misuse has been recognized as a defense to patent infringement if the patent is being used to restrain competition, particularly through "tying clauses" which require that, in order to get a license for one product, the purchaser must buy another also. *See United States v. Loew's, Inc.,* 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); *Morton Salt Co. v. G.S. Suppiger Co.,* 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942). Patent misuse doctrine is "an extension of the equitable doctrine of 'unclean hands' to the patent field." *U.S. Gypsum Co. v. National Gypsum Co.,* 352 U.S. 457, 77 S.Ct. 490, 1 L.Ed.2d 465 (1957). Patent and copyright doctrine can be compared on this point.

It has proven difficult to convince courts of the misuse defense. In *CBS v. American Society of Composers,* 400 F.Supp. 737 (S.D.N.Y.1975), CBS defended a copyright infringement claim by assailing ASCAP's and BMI's blanket licensing arrangements as copyright misuse. The court held that CBS failed to prove copyright misuse because it did not show that the defendants had "refused or would refuse to license their compositions ... or [had] otherwise used their collective leverage to compel CBS to license rights to music which it did not wish to license." 400 F.Supp. at 782. In *F.E.L. Publications, Ltd. v. Catholic Bishop,* 506 F.Supp. 1127 (N.D.Ill.1981), *rev'd on other grounds,* 214 U.S.P.Q. 409, 1982 WL 19198 (7th Cir.), *cert. denied,* 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982), the Circuit Court reversed the District Court and held that plaintiff's licensing agreement, which required licensees to pay for all 1,400 songs in its hymnal regardless of how many songs were actually copied, was no violation of the Sherman Act. *Id.* at 413–16. In *United Telephone, supra,* defendant increased its licensing fee 500% to 49 cents, but only after it had offered plaintiff the opportunity to license its telephone listings at 10 cents per entry. The court denied defendant's copyright misuse defense since defendant initially had been offered the lower price and because defendant had not shown that plaintiff's telephone list was a monopoly since defendant could canvass the city and develop its own list. 855 F.2d at 612.

■ Kinko's asserts that plaintiffs have misused their copyrights by impermissibly "broaden[ing] or extend[ing] the monopoly of [their] copyright in an effort to restrain competition." Defendant's Proposed Conclusions of Law, at 33–34. However, the facts of this case do not support a legal finding of copyright abuse. They show no agreement among plaintiffs to advocate any industry standard in excess of fair use. Plaintiffs' efforts to restrain competition by Kinko's is simultaneously an effort to stop Kinko's from infringing their copy-

rights. Plaintiffs have acted reasonably in so doing, not collusively for some illegal, monopolistic purpose. Consequently, Kinko's contentions fail.

 Defendant posits other arguments in favor of copyright misuse. They contend that plaintiffs "arbitrarily and capriciously refused to grant permission to Kinko's" while granting it to others, plaintiffs understaffed their permissions departments in order to delay processing and, in some cases, failed to process them at all.

Kinko's first contention is barred since it failed to *request* permission for any of the excerpts in suit.

 Kinko's fails to establish its second contention in two respects. Plaintiffs convincingly assert that they are in this business to make money and want to collect permissions fees. Therefore, it is unlikely that plaintiffs, in an attempt to spite Kinko's, are intentionally delaying their permissions process. Further, this court is unconvinced that a slow or backlogged permissions department constitutes a misuse of copyright.[15] Kinko's alleges that, not only the timing, but the cost of obtaining these permissions presents ob-

stacles for the copiers and universities. Kinko's failed to prove this as well.[16]

Similarly, Kinko's fails in its unclean hands defense. Defendant unconvincingly reasserts its "anticompetitive scheme" argument to support this defense.

## III. ESTOPPEL AND ACQUIESCENCE.

 The Ninth Circuit court in *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100 (9th Cir.), *cert. denied*, 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960), stated the elements of the estoppel defense. Plaintiff must know of the defendant's infringing conduct; plaintiff must intend that his conduct be acted on or must act in a way that the party asserting the estoppel had a right to believe it was so intended; defendant must be ignorant of the true facts; and defendant must rely on plaintiff's conduct to his detriment. *Id.* at 104. These four elements were adopted in *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 456 F.Supp. 531 (S.D.N.Y. 1977), *aff'd*, 592 F.2d 651 (2d Cir.1978); *Rohauer v. Killiam Shows, Inc.*, 379 F.Supp. 723 (S.D.N.Y.), *rev'd on other grounds*, 551 F.2d 484 (2d Cir.1977).

15. Defendants allege that the publishers' failure to respond promptly "creates serious problems for both teachers and students, causing considerable disruption and interference with the educational process." Defendant's Proposed Findings of Fact, at 20. Yet, Defendants did not produce any such testimony from a teacher or student. At a meeting of the National Association of College Stores, Kurt Koenig delivered a slide presentation addressing "the well-known problem of unreasonable delays and the response time" of permissions requests. In preparation for that meeting, Koenig was alleged to have run "pencil" tabulations on the same but the computer records of them were since "destroyed." (PX 352). Anecdotal testimony Kinko's claimed it would present at trial never materialized. Kinko's did supply deposition testimony of personnel from Plaintiffs' permissions departments regarding their permissions response times. At McGraw–Hill, turnaround averaged 3 to 4 weeks or 2 to 3 months if there was a backlog (DTX J–H, at 18–19); Morrow had one-month turnaround with some backlogged requests remaining in November 1989 from March 1989 (DTX I–W, at 24–28); Penquin averaged 1 week to 2 months (DTX I–Z, at 32); and Wiley averaged 2 to 4 weeks or 5 to 6 weeks if backlogged (DTX I–T, at 17–19).

16. Evidence presented at trial shows fees Kinko's paid Harper & Row for permission to copy its works. The royalties ranged from 50 cents to $5.00 per copy cost to the student, before copying costs (usually approximately 4 cents per page). (PX. 357). Those permissions which cost $5.00 per copy, rather than 50 cents, generally included a greater number of pages copied —200 to 300 or 500 pages—or perhaps an entire book. A cursory analysis of the exhibit shows that the permissions price is often a multiple of the number of copies requested, i.e. the number of students supplied. For example, 40 copies of an excerpt from the book *Living With Change: The Semantics of Coping* by Wendell Johnson and Dorothy Moeller brought a permissions price of $120.00. That particular request included 214 pages from this book (there was no notation stating whether this was the entire book). By comparison, 20 copies of an excerpt from *History of African Civilization* by E. Jefferson Murphy brought a permissions price of $80. This request included 400 pages, the entire work. While there is no set formula evidenced by these or other examples, there is also no evidence of exhorbitant pricing nor discriminatory scheme.

Plaintiff may be estopped from asserting its rights under a copyright if plaintiff has aided the defendant in infringing or otherwise induced them to infringe or has committed covert acts such as "holding out ... by silence or inaction." Nimmer, § 13.07, at 13–134 (acknowledging that such passive acts are rarely so held). "The plaintiff's acquiescence in the defendant's infringing acts may, if continued for a sufficient period of time and if manifested by overt acts, result in an abandonment of copyright." *Id.* at 13–135. In such a case, the estoppel "destroys the right asserted" and will be a defense for all acts occurring after the acquiescence. *Id.*

In *New Era Publications Int'l. v. Henry Holt & Co.*, 873 F.2d 576 (2d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990), the court denied plaintiff's request for permanent injunction on the grounds of laches. Before suing for an injunction, plaintiff waited two years after protesting to the defendant and drawing a flat refusal to cooperate. By this time, 12,000 copies of defendant's book, the subject of the suit, had been printed, packed and shipped to stores. The court found an "unconscionable delay" which would work a hardship on the defendant resulting in severe prejudice. *Id.* at 584–85.

 Defendant cites the testimony of one of plaintiff's witnesses in which he admits to continuous knowledge of Kinko's anthologizing since 1984 [17] and his "general" perception that Kinko's copying constituted infringement. *See* Testimony of Richard Rudick, Senior Vice President and General Counsel of John Wiley & Sons, Tr. 96–101. Kinko's argues that "the contin-

ued and open expansion of Kinko's educational photocopying without protest by plaintiffs created Kinko's detrimental reliance." Defendant's Proposed Conclusions of Law, at 33. Kinko's convincingly asserts that it has expended much time and energy in its Professor Publishing business and "has continued to expand its educational photocopying ... over the years in line with its [own] policies and procedures...." *Id.* at 32. However, this does not reach the level of detrimental reliance.

Plaintiffs argue they had no knowledge Kinko's was infringing, only that they were copying. Once they realized Kinko's was copying without permission, they complained and demanded fees.[18] Plaintiffs urge that only through discovery did they realize the extent of Kinko's copying without permission. Defendant has not supplied any proof to the contrary. Additionally, Kinko's has not shown that plaintiffs *intended* their inaction to be interpreted as a "license" to infringe its works nor that any action of plaintiffs' gave Kinko's the *right* to believe it had such a license. Plaintiffs have denied any such intent.

Lastly, the extent of the harm experienced by Kinko's works no substantial prejudice against it. Its detriment is that it will have to request permission the next time it wishes to copy and publish its Professor Publishing anthologies.

## IV. PLAINTIFFS' FAILURE TO RECORD TRANSFER INSTRUMENTS.

 Pursuant to 17 U.S.C. § 205(d), Kinko's challenges the court's jurisdiction of two of the works involved in this case:

---

17. In a memorandum dated September 1984, a copy of a Kinko's newsletter was sent to Richard Rudick of Wiley. The newsletter promoted Kinko's "On–Demand Publishing" service to college users and characterized the traditional publishing industry as "ineffective." (DTX C–D). In December 1984, the president of the Association of American Publishers, Inc., wrote a letter to Paul Orfalea, president of Kinko's Graphics Corporation, "express[ing] ... concern regarding misleading statements and omissions concerning copyright matters in Kinko's promotional material." (PX 52). Specifically, Townsend criticized Kinko's cavalier description of its responsibility pursuant to the copy-

right law and the Classroom Guidelines, and their inappropriate characterization of publishers as "uncooperative or inefficient." *Id.*

18. For example, in August 1988, McGraw–Hill complained to Kinko's about a 23–page excerpt copied from one of its books for a class of 96 students. Kinko's paid McGraw–Hill $2,000.00 in settlement of the dispute. Kurt Koenig, in a letter accompanying the check, commented that McGraw–Hill's permissions department had "provide[d] excellent service in the past." (PX. 62).

*Lyndon Johnson and the American Dream* and *The Money Market.* Plaintiffs Harper & Row and Jones–Irwin assert that they hold valid copyrights on these works. Defendant argues that plaintiffs' failure to record the instruments of transfer as to these two works prior to filing their original complaint on April 25, 1989, bars them from bringing suit.

Section 205(d) requires recordation of copyrighted works before institution of any suit thereon.[19] At the beginning of trial, during initial argument on this matter, this court ruled that the filing of a supplemental complaint would cure the jurisdictional defect caused by late recordation. *See* Tr. 3–11; Fed.R.Civ.P. 15(d). Plaintiffs recorded the instruments on June 26, 1990 and August 23, 1989, months after filing the original complaint. Plaintiffs filed a supplemental complaint pursuant to that ruling. Plaintiffs now argue that any jurisdictional defect is cured by its filing of its supplemental complaint. Plaintiffs' Post-Trial Memorandum of Law, at 15, n. 7.

Defendant argues that "the law is well-settled that a litigant cannot cure a jurisdictional defect by alleging facts that occurred only *after the action was brought.*" Defendant's Proposed Conclusions of Law, at 30–31 (original emphasis). Defendant is misguided. While recognizing that proper recordation is a jurisdictional prerequisite to instituting a copyright infringement suit, defendant fails to see that plaintiffs' recordation problem was cured by its supplemental filing which was allowed by this court pursuant to Fed.R.Civ.P. 15(d). Courts have held this to be proper procedure. "There is no question that leave to serve a supplemental pleading should be granted if it cures a jurisdictional defect." *Dan–Dee Imports, Inc. v. Well–Made Toy Mfg. Corp.,* 524 F.Supp. 615, 619 (E.D.N.Y. 1981) (citing *Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976)).

Filing a supplemental complaint, pursuant to Fed.R.Civ.P. 15(d), may relate back to the original filing so as to cure a jurisdictional defect. *See, e.g., Security Insurance Co. of New Haven v. United States,* 338 F.2d 444, 449 (9th Cir.1964) (supplemental complaint related back so as not to bar suit by statute of limitations even though supplement was filed more than a year after original suit); *Dan–Dee Imports, Inc. v. Well–Made Toy Mfg. Corp.,* 524 F.Supp. at 619–20 (amended and supplemental complaint accepted for filing when no prejudice shown to defendant). *See also Kenbrooke Fabrics, Inc. v. Soho Fashions, Inc.,* 690 F.Supp. 298, 302 (S.D. N.Y.1988) (plaintiff who recorded 8 months after beginning suit was not precluded from asserting rights because he filed before hearing); *Wales Industrial Inc. v. Hasbro Bradley, Inc.,* 612 F.Supp. 510, 514–15 (S.D.N.Y.1985) (recordation 5 weeks after filing the complaint cured any jurisdictional defect because recordation occurred before the hearing on the motion); *Meta–Film Associates, Inc. v. MCA, Inc.,* 586 F.Supp. 1346, 1351–52 (C.D.Ca.1984) (subsequent filing of assignment cured jurisdictional defect and related back); *Co-Opportunities, Inc. v. National Broadcasting Co.,* 510 F.Supp. 43, 49 (N.D.Ca. 1981) (subsequent recordation allowed to relate back).

Although plaintiffs filed their supplemental complaint after the start of trial, plaintiffs had recorded their transfer instruments months before. Defendant could not prove any prejudice, even if it had alleged it, since they had ample notice of plaintiffs' allegations with respect to the two books to conduct discovery. This court holds that plaintiffs' supplemental complaint relates back to the original complaint which is sufficient to comply with § 205(d). Plaintiffs' causes with regard to these two books stand and jurisdiction is properly within this court.

---

**19.** When the 1988 amendment of § 205(d) became effective March 1, 1989, the Berne Convention effectively eliminated the prior recordation requirement. However, the public law which then came into effect provides that "any *cause of action* arising under title 17 ... before [March 1, 1989] shall be governed by the provisions of such title as in effect when the cause of action arose." Pub.L. 100–568, § 13(b) (1988) (emphasis added). This public law reactivates the prior recordation requirement for the instances in suit.

## V. RELIEF.

### A. Injunction.

A plaintiff must show liability and the threat of continuing violation to be entitled to an injunction. *Universal City Studios, Inc. v. Sony Corp. of America*, 659 F.2d 963, 976 (9th Cir.1981), *rev'd on other grounds*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); Nimmer, § 14.06[B]. "[I]njunction is not the automatic consequence of infringement" but the result of equitable consideration. *New Era Publications Int'l v. Henry Holt Co.*, 884 F.2d 659 at 661 (2nd Cir.1989).

The Copyright Act places discretion in the court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). This discretion is generally believed to extend to enjoining infringement which may occur of works "which may in the future be owned by the plaintiff." Nimmer, § 14.06, at 14–61. This possibility creates two questions before the court.

First, are plaintiffs entitled to injunction against future infringement of the works in suit. Second, are plaintiffs entitled to injunction against future infringement of works which may not now be copyrighted or even in existence but, in the future, may be copied by defendant.

We answer both questions in the affirmative. When liability has been determined, and a history of continuing infringement and a significant threat of future infringement exists, a court must enjoin infringement of future copyrighted works. *Orth–O–Vision, Inc. v. Home Box Office*, 474 F.Supp. at 685–86 (infringement persisted from 1974 until 1978 when Orth–O–Vision filed suit alleging antitrust violations); *see also Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 94 (2d Cir.), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978) (preliminary injunction affirmed upon a finding that irreparable injury may be presumed when copyright is infringed).

In this case, liability has been determined and there remains a significant threat that Kinko's will continue to infringe plaintiffs' copyrights given the nature of Professor Publishing and Kinko's historic willful blindness to the copyright law. Although there is little history established on the record of Kinko's infringing these publishers' copyrights prior to 1989, this court has found that Kinko's has conducted its Professor Publishing business at least since the mid–1980's. The nature of Professor Publishing makes it particularly susceptible to infringement because of the large volume of copying it conducts and the added threat created by anthologizing. Additionally, the willfulness defendant exhibited in this case persuades this court that "there is a strong possibility that defendant[ ] will engage in continuing copyright violations unless an injunction is issued." *Encyclopaedia Britannica Educational Corp. v. Crooks*, 542 F.Supp. 1156, 1187 (W.D.N.Y.1982). For these reasons, this court thinks it prudent and equitable to grant plaintiffs' request for injunction and will enjoin defendant from future anthologizing and copying of plaintiffs' works without permission and prepayment of fees in the manner shown violative of the concept of fair use as proved in this case, and including similar works not currently existing but which may in the future be owned by plaintiffs and as to which plaintiffs have not consented.

Plaintiffs request an injunction against all unconsented anthologizing. This court refuses to do so for the simple reason that some anthologizing may fall within fair use requirements. This court is not in the position, for example, to enjoin uses which are fair as determined by the Guidelines and set out in the Copyright Act.

### B. Declaratory Judgment.

Plaintiffs request this court to declare "that Kinko's infringes when it copies, anthologizes, and sells excerpts of plaintiffs' works without permission." Plaintiffs' Post-trial Memorandum of Law, at 54.

■ For declaratory judgment, a controversy must be "of a justiciable nature, thus excluding an advisory decree upon a hypothetical state of facts." *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 325, 56 S.Ct. 466, 473, 80 L.Ed. 688, 699 (1936). Title 28 of the U.S.Code requires that there be an "actual controversy." 28 U.S.C. § 2201. "The existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate." Fed.R.Civ.P. 57. The test for determining when an actual controversy exists was set forth by the Supreme Court in *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941):

Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Id.; see also Salomon Bros., Inc. v. Carey*, 556 F.Supp. 499, 501 (S.D.N.Y.1983).

■ The Second Circuit has held that: " 'The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to proceeding.' ... [I]f either of these objectives can be achieved the action should be entertained and the failure to do so error."

*Broadview Chemical Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir.), *cert. denied*, 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1970) (quoting Borchard, Declaratory Judgments 294, 299 (2d ed. 1941)). Lastly, it is within the court's discretion to determine when declaratory judgment is appropriate; equitable principles govern this discretion. Declaratory judgment is inappropriate in this case.

Plaintiffs say they are entitled to declaratory judgment as to *any and all* instances of copying or "anthologizing" without the author's permission. This is not so. The fact that Congress has set forth a statement in its Classroom Guidelines that anthologizing is prohibited does not require this court to paint with the broad brush plaintiffs suggest. Declaring that all anthologies published without permission is infringement would preclude fair use analysis of any excerpt included in an anthology. If Congress meant for anthologizing to nullify a fair use analysis, it would have expressly said so. The Guidelines state that some instances of copying which exceed its boundaries may in fact "be permitted under the criteria of fair use." House Report, at 68, U.S.Code Cong. & Admin.News 1976, p. 5681. Declaratory judgment is denied.

C. Damages.

1. *Statutory damages.*

■ A copyright owner may elect to recover statutory damages instead of actual damages and profits. 17 U.S.C. § 504(c)(1). Plaintiffs have made that election. Once the plaintiff elects statutory damages, that remedy is generally exclusive. *Oboler v. Goldin*, 714 F.2d 211, 213 (2d Cir.1983).

■ Title 17 of the United States Code, Section 504(c)(2) provides for statutory damages of up to $100,000 for each infringement when an infringement is willful. Plaintiffs have the burden of showing defendant's "willfulness" in order to receive statutory damages. Plaintiffs may show willfulness by showing that defendant recklessly disregarded plaintiffs' rights. *Wow & Flutter Music v. Len's Tom Jones Tavern, Inc.*, 606 F.Supp. 554, 556 (W.D.N.Y.1985); *Lauratex Textile Corp. v. Allton Knitting Mills*, 519 F.Supp. 730, 733 (S.D.N.Y.1981). Plaintiffs also sustain their burden by showing defendant knew or "should have known" it infringed their copyrights. *Fallaci v. New Gazette Literary Corp.*, 568 F.Supp. 1172, 1173 (S.D.N.Y.1983). Willful does not mean "malicious," rather, it means "with knowledge," whether actual or constructive. *See Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co., Inc.*, 807 F.2d 1110, 1115 (2d Cir.1986), *aff'd*, 862 F.2d 304

(1988) ("a defendant's actual or constructive knowledge proves willfulness.").

In *Fallaci*, the court found that the publisher of a copyrighted newspaper should have been aware "that its unauthorized republication of a Washington Post article constituted copyright infringement." 568 F.Supp. at 1173; *see also Warner Bros., Inc. v. Dae Rim Trading, Inc.*, 677 F.Supp. 740, 764 (S.D.N.Y.1988), *aff'd in part, rev'd in part*, 877 F.2d 1120 (2d Cir.1989) (defendant's actions not willful when they " 'were not aware and had no reason to believe that his or her acts constituted an infringement of copyright'."). Similarly, in *Engel v. Wild Oats, Inc.*, 644 F.Supp. 1089 (S.D.N.Y.1986), the court found that the defendant willfully copied a photograph when the art director "knew or should have known that the unauthorized reprinting of a photograph was a copyright violation." *Id.* at 1092. Although the court could not find evidence of actual knowledge, it found that the defendant had a reckless disregard for the plaintiff's rights. *Id.*

■ In deciding an award of statutory damages the court should take a number of factors into consideration. Courts in the past have used a wide array of criteria: fair market value of the rights infringed, *Quinto v. Legal Times of Washington*, 511 F.Supp. 579, 582 (D.D.C.1981); revenue lost by the plaintiff and profits gained by the defendant, *Boz Scaggs Music v. KND Corp.*, 491 F.Supp. 908, 914 (D.Conn.1980); the infringer's state of mind, *Id.;* and deterrence of future infringement. *See Fallaci v. New Gazette Literary Corp.*, 568 F.Supp. at 1174 (doubling the fair market value of the infringed right to arrive at an amount sufficient to deter a willful infringer because "[a] willful infringer ... should be liable for a substantial amount over and above the market value of a legitimate license."); *Lauratex Textile Corp. v. Allton Knitting Mills*, 519 F.Supp. 730, 733 (S.D.N.Y.1981) (court arrived at $40,000

statutory damage figure based on $5,000 actual revenue to the infringer and defendant's willfulness); *Lauratex Textile Corp. v. Allton Knitting Mills*, 517 F.Supp. 900, 903–04 (deterrence needed in case where there was evidence of numerous suits in which Allton's president was a defendant and negative inference drawn from his refusal to testify).

■ Kinko's maintains that, if at all, it is an innocent infringer. The statute provides a damage amount of $200.00 if a defendant shows that it was not aware and had no reason to know it was infringing. 17 U.S.C. § 504(c)(2). The defendant shoulders the burden of proving this good faith and that its belief was a reasonable one. Nimmer on Copyright § 14.04[B][2], at 14–40.1—14.40.2. *See also Peer International Corp. v. Pausa Records*, 909 F.2d 1332, 1336 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1019, 112 L.Ed.2d 1100 (1991) (defendant must show reasonable good faith belief to refute evidence of willful infringement). The minimum damage figure is mandatory, not discretionary, upon the court finding good faith. *Id.* at 14–40.2—14–40.3. Kinko's has failed to prove it was an innocent infringer by failing to show its good faith. Kinko's should have known that it was infringing plaintiffs' copyrights.

One method of assessing Kinko's willfulness is through the training Kinko's provided its employees regarding fair use requirements. At trial, defendant produced Kinko's "Policies and Procedures" manual (Exhibit K), its "Copyright and Professor Publishing Handbook" (Exhibit H),[20] its "Co-worker Handbook" (Exhibit B), and a "Transcript of Kinko's Copyright Training Video" (Exhibit A–S (1)). These documents show that Kinko's intentionally and as a market strategy targeted college buyers and aggressively pursued their business through its Professor Publishing business.

20. Kinko's Copyright and Professor Publishing Handbook ("Handbook") provides that "[a] copyright notice and credit line should appear on the first page of every copyrighted work reproduced in a Professor Publishing packet, regardless of whether or not permission was obtained or a royalty fee was required." Page 10. It is questionable how seriously Kinko's took its own procedures since this credit line appeared in none of the five packets produced at trial.

In the "Classroom Guidelines" section of the Handbook, it provides:

> The guidelines state the minimum, but not the maximum, amount of photocopying permissible under fair use with regard to copies for classroom use. The guidelines ... do not assist a person whose materials reach beyond the stated limits. Since almost every case of college or university level copying will reach beyond the scope of the limits, the guidelines have little application for the college and university classroom situations.

Handbook, page 14. In so stating, Kinko's appears to have exempted itself from the purview of the Guidelines altogether. To the contrary, being beyond the scope of the Guidelines, to this court, still renders Kinko's subject to fair use law. Kinko's never acknowledges that its role as a commercial enterprise may in any way affect the fair use determination even though § 107 expressly provides that commercial use is to be considered and Supreme Court precedent states that it is "presumptively ... unfair." *See Sony Corp.*, 464 U.S. at 451, 104 S.Ct. at 793.[21]

Kinko's instructions to its workers possessed little of the nuance of the copyright law. They provided no hypothetical situations nor any factual summary of the state of the law presently. There was no mention of the facts of the *Sony* case, the *Salinger* case, the *Harper & Row* case or others which may illustrate some of the complexities of this doctrine. This can hardly be considered a "good faith" effort on Kinko's part to educate their employees. To the contrary, it appears more to be a way to "cover" themselves while Kinko's remained willfully blind to the consequences of their activity.

This court also finds and concludes that substantial damages are necessary to deter Kinko's from repeating the conduct proved in this case. As noted above, Kinko's has substantial income and assets: in 1989, net income of $3 million and assets of $15 million. All of the instances of copying were conducted with the same motive and intent. Therefore, this court will assess statutory damages in the amount of $50,000 for nine of the 12 infringements, and $20,000 for three[22] of the infringements for a total of $510,000. Here we are not attempting to measure the financial loss to the plaintiff but to deter the defendant from future infringing copying.

### 2. *Agency.*

Defendant claims it acted as the agent of the educational institutions when it copied the excerpts in suit. Section 504(c) provides that the court "shall remit statutory damages ... where an infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use ..., *if* the infringer was (i) an employee or agent of a nonprofit educational institution...." 17 U.S.C. § 504(c)(2). Kinko's claims to demonstrate its role as an agent through several factors: the professor selects the works to be copied, directs Kinko's to copy, and seeks permission to copy *on behalf of* the professor. Additionally, the professor signs an order form which states:

> The materials to be copied ... are for classroom use of no more than one copy per student, constitute only a small part of the entire work, and are to be solely for non-profit, non-commercial educational purposes in teaching activities. If such copies were not available, I would not require students to purchase the work.

---

**21.** In his capacity as legal counsel to Kinko's, at trial Kurt Koenig was qualified as an expert for the purpose of testifying on the issue of fair use. He explained each of the four factors and his understanding of their application. He testified at length on the company's policy on fair use and his training of Kinko's employees. Tr. 330–541. However, Koenig admitted that, given a hypothetical situation, he had no way of knowing the fair use analysis a Kinko's employee would apply. Tr. 604.

**22.** This court awards a lesser amount of damages for the infringements of *Understanding Capitalism, A Lesser Life,* and *Group Dynamics: The Psychology of Small Group Behavior* because the copying was less.

Defendant's Proposed Conclusions of Law, at 38–39. Defendant cites no caselaw in support of its position that this constitutes an agency relationship.

Since the Act does not define "agent," we will use state law to guide us on this issue.

> Three elements are required to establish an agency. First, there must be a manifestation by the principal that the agent shall act for him. Second, the agent must accept the undertaking. Lastly, there must be an understanding between the parties that the principal is to be in control of the undertaking.

*S.E.C. v. American Bd. of Trade, Inc.*, 654 F.Supp. 361, 366 (S.D.N.Y.), *aff'd in part, dism'd in part*, 830 F.2d 431 (2d Cir.1987) (citing Restatement (Second) of Agency § 1 comment b (1977)). New York common law principles provide that agency is a fiduciary relationship "which results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *Meese v. Miller*, 436 N.Y.S.2d 496, 499, 79 A.D.2d 237 (App.Div. 4th Dept.1981). "[T]here can be no agency relationship where the alleged principal has no right of control over the alleged agent." *Mazart v. State*, 441 N.Y.S.2d 600, 605, 109 Misc.2d 1092 (N.Y. Ct.Cl.1981). However, every detail need not be determined by the alleged principal. An agency may exist where the principal retains the right "to make management and policy decisions affecting the agent." *Id.*

This court has confirmed the soundness of these principles. *See Ahn v. Rooney, Pace Inc.*, 624 F.Supp. 368, 370–71 (S.D.N.Y.1985) (element of "subservience" is essential to agency). The Second Circuit is in accord. In *In re Shulman Transport En-*

terprises, Inc., 744 F.2d 293 (2d Cir.1984), the court stated the essential elements of an agency relationship are direction and control. *Id.* at 295 (citing Restatement (Second) of Agency § 1(1) comment b, § 14 (1958)).

Plaintiffs assert that Kinko's presented no testimony at trial from the universities involved that there was any agency relationship to demonstrate the requisite element of direction and control. Because Kinko's has not shown that the professors exerted a sufficient level of control over the relationship, we agree with plaintiffs that this defense is not available to Kinko's.

Even if Kinko's could show an agency relationship, it has not shown that its behavior was the kind anticipated by Congress and excused under section 504(c).[23] Implicit in section 504(c) is some showing that the defendant was an innocent actor. The agency relationship requires that the defendant lack control over its actions. This kind of actor, understandably, should be protected. Kinko's was no such innocent party.

Kinko's had control over the permissions process: determination whether a passage required permission or was fair use; whether permission was sought after the fair use determination; and when and how permission was pursued. The professors merely handed in the signed form, claiming responsibility, but in actuality relinquished several key aspects of control to Kinko's. Therefore, Kinko's has failed to show that it should receive remitted damages.

We will not here discuss whether it was reasonable for Kinko's to believe its copying was a fair use, since a finding of no agency relationship precludes a determina-

---

**23.** By analogy, Section 108 of the House Report, entitled "Reproduction by Libraries and Archives," provides that:

> it would not be possible for a non-profit institution, by means of contractual arrangements with a commercial copying enterprise, to authorize the enterprise to carry out copying and distribution functions that would be exempt if conducted by the non-profit institution itself.

H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 74 (1976), U.S.Code Cong. & Admin.News 1976, p. 5688. This comes as close to approximating the present circumstance as anything plainly stated in the legislative history and supports persuasively plaintiffs' argument that Congress did not intend to permit Kinko's to act as an agent of the colleges to conduct the volume of copying shown in this suit.

tion for remission of damages under the statute.

### D. Attorneys Fees and Costs.

█ Attorneys fees and costs may be awarded pursuant to 17 U.S.C. § 505. "Fees and costs in copyright infringement cases, like statutory damages, are matters assigned to the court's discretion, to be awarded with an eye toward encouraging the pursuit of colorable copyright claims and deterring further infringement." *Engel v. Wild Oats, Inc.*, 644 F.Supp. 1089, 1093 (S.D.N.Y.1986). *See also Oboler v. Goldin*, 714 F.2d at 213 ("Such an award assures equal access to courts, provides an economic incentive to challenge infringements, and penalizes the losing party."). "Because Section 505 is intended in part to encourage the assertion of colorable copyright claims and to deter infringement, fees are generally awarded to prevailing plaintiffs." *Diamond v. Am–Law Publishing Corp.*, 745 F.2d 142, 148 (2d Cir.1984). *See also Whimsicality, Inc. v. Rubies Costume Co., Inc.*, 891 F.2d 452, 457 (2d Cir. 1989) ("Plaintiffs who prevail are awarded fees as a matter of course."); *Roth v. Pritikin*, 787 F.2d 54, 57 (2d Cir.1986) (prevailing plaintiff is generally entitled to fees).[24] In addition "[b]ecause the award of fees has a statutory basis, a finding of subjective bad faith is not necessary." *Diamond*, 745 F.2d at 148.

Nimmer states that, even though the law does not require a finding of culpability, "the mere fact that the plaintiff has won at trial means that the defendant has been adjudged 'guilty of infringement.' That finding, even absent a further finding of 'deliberate infringement,' establishes a blameworthiness of sorts on the defendant's part." Nimmer, § 14.10[D][2], at 14–84.10. Accordingly, we are awarding plaintiff's attorneys fees and costs.

Some courts have required some evidence of willfulness. In *Fallaci*, the court found that defendant's "willful" infringement was a deciding factor in allowing

attorney's fees. 568 F.Supp. at 1174. Further, in *Bourne Co. v. MPL Communications, Inc.*, 678 F.Supp. 70, 72 (S.D.N.Y. 1988), the court refused to award fees to the plaintiff's attorney because of the novelty of the issues involved in the case and the lack of bad faith on the part of the defendant.

As discussed *infra*, the issues involved in this case bear some degree of novelty. Though settlement agreements have been entered, there has been no judicial determination of a copyshop case before now. *See* PX. 59, 60, 61. The copying conducted in previous cases has involved library or telephone directory copying. However, fair use doctrine itself is no novelty. Koenig's testimony regarding fair use failed to acknowledge the kind of critical analysis required in making these evaluations. It showed no evidence of Kinko's having wrestled with the determinations of the excerpts in suit. As a result, Kinko's copying has been found by this court to be willful. Given these circumstances, this court finds it reasonable to award attorney's fees and costs to plaintiffs.

### CONCLUSION

This court finds the excerpts copied by defendant Kinko's are not a fair use of plaintiffs' copyrights and, therefore, constitute infringement. Further, Kinko's defenses of copyright misuse, unclean hands, and estoppel fail. Plaintiff is granted statutory damages, injunctive relief and attorneys' fees and costs. Submit order on 15 days notice to defendant.

SO ORDERED.

---

**24.** Other circuits have held that attorney's fees should not be awarded as a matter of course in every case. *See* Annotation, *Award of attorney's* *fees under §§ 101 et seq. of Copyright Act, 17 USCS § 505—Modern Cases*, 85 ALR Fed. 435, § 3[b], at 455 (1987).